SALVADOR E. SUAZO, peticionario y apelante, *v.* ANDRÉS A. LUGO, demandado y apelado.

No. 4301.—*Sometido:* Noviembre 25, 1930. *Resuelto:* Marzo 31, 1931.

*J. B. Soto* y *J. Iglesias de la Cruz,* abogados del apelante; *R. A. Gómez,* abogado de *El Pueblo,* apelado.

El Juez Asociado Señor Texidor, emitió la opinión del tribunal.

Salvador E. Suazo fué acusado por el fiscal del distrito de San Juan, Puerto Rico, por infracción de la sección o artículo 18 de la ley número 19, Asamblea Legislativa de Puerto Rico, año 1928, para reglamentar la venta de café extranjero. Este acusado fué detenido, y presentó ante la Corte de Distrito de San Juan, Puerto Rico, una petición de hábeas corpus, que fué oída por la corte, y ésta, finalmente, dictó una resolución denegatoria, de la que se ha apelado ante este tribunal.

La ley que se dice infringida, es así:

"Sección 18.—Los traficantes en café extranjero que lleven libros oficiales, los tendrán a la disposición de los agentes de rentas internas para cualquier inspección de los mismos que desearen hacer en cualquier ocasión."

El acusado Suazo se negó a presentar tales libros a un agente de rentas internas, afirma el fiscal en su acusación.

El peticionario alegó: que los hechos que se le imputan no constituyen delito público alguno; que la ley No. 19, que se dice infringida impone a los traficantes en café extranjero la obligación de tomar una licencia, a renovarla cada tres meses y por valor de $20 para el tráfico al por mayor, y de $5 para el tráfico al detalle; que esa ley impone a los dichos traficantes el pago de estampillas preparadas por el Tesorero de Puerto Rico, por dos centavos por libra de café que vendan, y lo mismo por el que exporten, y al imponer tales contribuciones de rentas internas, y de exportación, viola la sección 3 de nuestra Ley Orgánica, y la Constitución de los Estados Unidos.

En la apelación se asignan a la resolución de la corte de

distrito dos errores, que debemos estudiar. En la realidad la asignación puede reducirse a un error, el de declarar que la ley es constitucional y válida.

Como lo ha hecho el apelante, tiene este tribunal que decidir los distintos motivos o cuestiones legales, para proceder con método a su estudio y resolución.

Se ha argumentado en este caso acerca del precedente en esta jurisdicción, casos *Nazario v. Gallardo,* 40 D.P.R. 791. La cuestión primordial no fué presentada de una manera completa y total en esos casos.

La Ley No. 19, de 19 de abril de 1928, tiene el siguiente título:

"Ley para reglamentar la venta de café extranjero puro o mezclado con café de Puerto Rico y para proveer fondos con que pagar los gastos que ocasione tal reglamentación, y para otros fines."

Por su título, esta ley va dirigida a la reglamentación de venta, no de todo el café con que pueda comerciarse en Puerto Rico, sino única y exclusivamente del café que se designa como "extranjero". Y si vemos el artículo o sección 24 de esta ley, encontramos que para sus fines, es café extranjero todo el que no haya sido cosechado o producido en Puerto Rico.

¿Es ésta una ley de inspección? Este es uno de los primeros problemas a resolver en este caso.

Desde luego, es de poca importancia el nombre que se dé a la ley. Así, en el caso *Wagner v. City of Covington,* 251 U. S. 95, se dice:

". . . apenas si es necesario repetir que cuando esta corte está llamada a catar, mediante las disposiciones de la Constitución de los Estados Unidos, una contribución impuesta por un estado, nuestra decisión debe depender, no de la forma del plan de contribuciones, o de cualquier caracterización del mismo adoptada por las cortes del estado, sino más bien de la acción práctica y del efecto de la contribución tal cual se aplica y se pone en vigor. . ."

En este caso se trataba de una licencia de venta; pero

la imposición alcanzaba lo mismo a los del Estado de Kentucky, que a los de cualquier otro Estado. Desde luego es de tenerse en cuenta lo anotado, porque fija una regla importantísima: la de estimar la naturaleza del tributo o carga por sí misma, por su esencia y sus efectos, y no por el nombre que se le haya querido dar.

¿Crea la ley de 1928, de que se trata aquí, un *tax*, una contribución, un impuesto, o es simplemente un derecho de inspección?

Aunque, como expondremos, no tiene este punto la gran importancia que, a primera vista aparenta, es conveniente decir algo para resolverlo.

Sería imposible citar aquí todas las definiciones hechas por diversos tribunales de la Unión. Pero es necesario presentar algunas.

"Las contribuciones se definen como cargas o gravámenes impuestos por el poder legislativo sobre las personas o los bienes, para levantar fondos destinados a fines públicos."

Esta definición del diccionario de Webster fué adoptada y citada en gran número de decisiones; pero en ninguna ocasión se ha afirmado con tanta fuerza como en el caso *Loan Association* v. *Topeka*, 20 Wall. U. S. 655, que nos proponemos citar más por extenso en esta opinión.

En la decisión en el caso *Loan Association* v. *Topeka*, 20 Wall. 655, se dijo por la Corte Suprema de los Estados Unidos, lo que copiamos:

"Debe admitirse que hay derechos en todo gobierno libre que están fuera del dominio del estado. Un gobierno que no reconociera esos derechos, que mantuviera la vida, la libertad y la propiedad de sus ciudadanos sujetas en todo tiempo a la absoluta disposición y al dominio ilimitado aún del más democrático depositario de poderes, no sería, al fin y al cabo, más que un despotismo. Es verdad que sería el despotismo de los más, de la mayoría, si queréis llamarlo así, pero no dejaría por eso de serlo en lo más mínimo. Si un hombre ha de mantener todo aquello que esté acostumbrado a llamar suyo, todo aquello en que haya depositado su felicidad, y cuya seguridad

sea esencial a su bienestar, bajo el dominio ilimitado de otros, puede muy bien dudarse si no es más sabio que ese poder deba ser ejercido por uno que por muchos.

"La teoría de nuestros gobiernos, estadual y nacional, es opuesta al discernimiento de poderes ilimitados en nadie. Las ramas ejecutiva, legislativa y judicial de estos gobiernos son todas de poderes limitados y definidos.

"Hay limitaciones en tales poderes que emanan de la naturaleza esencial de todos los gobiernos libres. Hay reservas tácitas de derechos individuales, sin las que no podría existir el conglomerado social, y que son respetadas por todos los gobiernos que sean acreedores al nombre que ostenten. Ninguna corte, por ejemplo, vacilaría en declarar nulo un estatuto que proveyera que A y B, que son marido y mujer, dejaran de serlo, y que con posterioridad a la aprobación del mismo, A se convirtiera en el esposo de C y B en la esposa de D. O que dispusiera que el hogar seguro perteneciente en la actualidad a A dejará de ser suyo y en el futuro será de B.

❋   ❋   ❋   ❋   ❋   ❋   ❋

"El poder de imponer contribuciones es, por tanto, el más fuerte, el más difusivo de todos los poderes del gobierno, que llega directa o indirectamente a todas las clases sociales. El Juez Presidente Sr. Marshall dijo en el caso de McCulloch v. The State of Maryland, que el poder de imponer contribuciones es el poder de destruir. Un ejemplo resaltante de la solidez de esa proposición se observa en el hecho de que la presente contribución del diez por ciento impuesta por los Estados Unidos sobre el funcionamiento de todos aquellos bancos que no sean nacionales, hizo desaparecer, dentro de uno o dos años de haber sido aprobada, todos los bancos estaduales. Este poder puede ser utilizado tan fácilmente contra una clase de individuos como en favor de otra, en forma tal que arruine a una clase y conceda riqueza y prosperidad ilimitadas a la otra, de no existir una limitación implícita respecto al uso que ha de darse a tal poder.

"Ejercer con una mano el poder del gobierno sobre la propiedad del ciudadano, y conferirlo con la otra a individuos favorecidos para ayudar empresas privadas y levantar fortunas particulares, no deja de ser un robo porque se haga bajo visos de legalidad y porque se le llame imposición de tributos. Esto no es legislar. Esto es decretar bajo fórmulas legislativas."

No puede concebirse el poder de imponer contribuciones como ilimitado y arbitrario.

La primera limitación de ese poder se encuentra en su

propia naturaleza. La contribución, gravamen impuesto a los ciudadanos con detracción de sus riquezas o sus ganancias, ha de fundarse, para ser legal, en la necesidad de atender los servicios públicos o los fines de la comunidad. A este principio, a un mismo tiempo rigurosamente científico y esencialmente práctico han respondido todos los códigos políticos fundamentales de los pueblos civilizados. Y la Constitución de los Estados Unidos, en su Sección 8, Artículo Primero, lo encarna así:

"El Congreso tendrá facultad: Para establecer y recaudar contribuciones, derechos, impuestos y arbitrios a fin de pagar las deudas y proveer a la defensa común y bien general de los Estados Unidos; pero todas las contribuciones, derechos, impuestos y arbitrios serán uniformes en todos los Estados Unidos."

Para proveer a la defensa común y al bienestar general de los Estados Unidos, es decir, para la comunidad, y para beneficio de todos, se establece y justifica ese poder del Congreso.

En la opinión concurrente del Juez Field en el caso *Pollock* v. *Farmers' Loan and Trust Co.*, 157 U. S. R. 429, encontramos:

"Según sostiene el abogado: 'No hay tal cosa en la teoría de nuestro gobierno nacional como el poder ilimitado del Congreso para imponer contribuciones. Hay limitaciones,' según él observa con razón, 'de sus poderes, que emanan de la naturaleza esencial de todo gobierno libre; hay reservas de derechos individuales, sin las que la sociedad no podría existir, y que son respetadas por todo gobierno. El derecho a imponer tributos está sujeto a estas limitaciones.' Loan Association v. Topeka, 20 Wall. 655, y Parkersburg v. Brown, 106 U. S. 487." (De la página 599, Tomo citado.)

"La naturaleza inherente y fundamental de un tributo es la de una contribución para el sostenimiento del gobierno, impuesta sobre el principio de igual y uniforme prorrateo entre las personas afectadas por el impuesto, y cualquiera otra exacción no cae dentro de la definición legal de una contribución."

En la nota en el caso *City of New Orleans* v. *Great*

*Southern Telephone and Telegraph Company,* 8 Am. State Reports, 506, se incluyen varias definiciones del término "tax" que concuerdan, en su esencia, con el concepto que exponemos.

Es indudable que la ley de que tratamos, crea un gravamen, un tributo, o una carga, sobre determinada industria; la de la venta en el país y la de la exportación, de café extranjero, entendiéndose por tal el que no se ha cultivado, recolectado, o producido, en Puerto Rico; que esa carga, tributo, o contribución, grava solamente el café extranjero, y el tráfico y negocio sobre el mismo, y no afecta al tráfico y negocio sobre el café producido en Puerto Rico.·

¿Cómo se establece ese gravamen o tributo? En las secciones 2, 9 y 10 de la ley de que se trata, se establece el tributo en la forma que sigue:

"Sección 2.—Dicha persona, firma o compañía deberá solicitar, por escrito, del Tesorero de Puerto Rico, antes de dedicarse a traficar con café extranjero puro o mezclado con café de Puerto Rico, la correspondiente licencia, la cual deberá ser renovada trimestralmente, debiendo cancelar sobre cada licencia expedida sellos de rentas internas por valor de veinte (20) dólares si se trata de traficantes al por mayor, y de cinco (5) dólares cuando se trate de traficantes al detall. Estas licencias vencerán el día primero de cada uno de los meses de enero, abril, julio y octubre.

    ❋        ❋        ❋        ❋        ❋        ❋        ❋

"Sección 9.—Todo café extranjero en granos enteros, crudo o tostado, triturado o molido que se venda, al por mayor o al detall, dentro del territorio de Puerto Rico, (o que se exporte de Puerto Rico para cualquier punto de los Estados Unidos o de país extranjero) deberá llevar adherido o fijado en los sacos o envases en que se coloque o empaque para su venta o explotación, un sello o estampilla en el cual estará estampado, impreso o grabado lo siguiente: 'Café Extranjero—Foreign Coffee.' Los expresados sellos o estampillas se confeccionarán y fijarán o adherirán de manera que en cuanto sea posible, no puedan ser imitados, cambiados ni falsificados, y de modo que, al abrirse el saco o envase, sea destruído el sello; *Disponiéndose,* que dichos sellos o estampillas, serán fijados en, o adheridos a los expresados continentes cuando su contenido consista en granos

enteros o triturados de dicho fruto, cosechado totalmente en el extranjero, o mezclado con granos enteros o triturados de dicho fruto cosechado en Puerto Rico, o de polvo de café extranjero o mezclado con café de Puerto Rico; y que serán fijados, o adheridos por la persona que venda o exporte dicho fruto, antes de que éste salga del almacén, depósito, tahona o sitio cualquiera, en que se le tuviere para su venta al por mayor o detall; *Disponiéndose, además,* que cuando la venta se hiciere de un traficante al por mayor a un traficante al detall establecido en Puerto Rico, corresponderá a éste último el fijar sobre los envases la estampilla correspondiente al vender al consumidor.

"Sección 10.—Los sellos o estampillas a que se refiere la sección anterior de esta Ley, se prepararán, emitirán y distribuirán por el Tesorero de Puerto Rico y serán de los valores que fije dicho Tesorero, sobre la base de dos (2) centavos por cada libra. El valor de cada sello o estampilla se grabará o imprimirá también en ellos en forma legible; se tendrán a la venta y distribución en las Colecturías de Rentas Internas."

Tenemos, pues:

(*a*) Una licencia para el tráfico en café extranjero.

(*b*) Un pago, en sellos de rentas internas, de dos centavos por libra de café extranjero.

(*c*) La venta, negociación, o tráfico del café producido en Puerto Rico, no aparece gravada, ni con la imposición de licencia, ni con la de fijar, previo pago, sellos de clase alguna en los envases del producto.

La ley, sección 24, define el café extranjero como "todo el que no haya sido cosechado o producido en Puerto Rico".

Para completar los precedentes es necesario tener en cuenta que:

. (*a*) La sección 23 de la ley citada, dispone que los fondos o producto de la venta de los sellos y de las licencias y las multas, creados o impuestos por la misma ley ingresarán en el Tesoro Insular y constituirán un fondo especial, que se llamará "Fondo de Protección Cafetera".

(*b*) Que la Legislatura de Puerto Rico, en 1930, pasó la Ley No. 4, por la que se autorizó al Gobernador de Puerto Rico a disponer de los balances pasado y de 1930 del fondo

de protección cafetera, después de cubiertos los gastos de fiscalización e inspección, para el fomento de la agricultura y la instrucción rural en las zonas cafeteras de Puerto Rico, y fomento de la agricultura, etc.

(c) Que en el mismo año 1930, en la Ley de tarifas aprobada por el Congreso de los Estados Unidos, aparece una Sección, la 319, cuyo texto es:

"Sección 319 (m).—*Impuesto sobre el café importado en Puerto Rico.*

"Por la presente se autoriza a la Legislatura de Puerto Rico a imponer derecho de importación sobre el café importado en Puerto Rico, incluyendo el café molido en un país extranjero que entre a Puerto Rico procedente de los Estados Unidos. Tales derechos serán cobrados y tratados en la forma dispuesta actualmente por la ley en los casos de derechos de importación cobrados en Puerto Rico."

(d) Que en Resolución Conjunta No. 59 de la Asamblea Legislativa de Puerto Rico, aprobada en 5 de marzo de 1930, se estableció, a partir de 1 de agosto de 1930, un derecho de importación de diez centavos por libra a todo café que se importara en Puerto Rico, empezando a regir la ley tan pronto como se aprobara por el Congreso de los Estados Unidos cualquier ley autorizando a la Legislatura de Puerto Rico a imponer un derecho de importación al café que se importara en Puerto Rico.

Estas disposiciones de la ley de 1928 para reglamentar la venta de café extranjero ¿contienen una imposición de contribuciones, o son determinantes de un derecho de inspección?

Parece ser éste uno de los problemas más importantes del caso, y si lo fuera, encontraríamos ya una decisión, la del caso *Nazario* v. *Gallardo,* Tesorero, 40 D.P.R. 791, en que se dijo que la ley creaba un derecho de inspección (*inspection fee*).

En los casos *Nazario* v. *Gallardo, supra,* la cuestión más importante era si se trataba de una contribución en la que

el pago bajo protesta pudo dar margen a recobrar el importe.

En este caso el apelante, y por él su representación el Abogado D. Juan B. Soto, presenta la cuestión en otros términos: Si, sea derecho de inspección o contribución, pudo la Legislatura crear una inspección de carácter de privilegio, discrimen o diferencia, en favor de unos comerciantes en café de Puerto Rico, y en perjuicio de otros que comercian o trafican en café extranjero, dentro del mismo territorio.

Para el estudio y resolución de esta cuestión, precisa ordenar y someter a método los distintos extremos presentados.

Las leyes, a cuya luz deben estudiarse aquellos problemas, son:

1. La Constitución de los Estados Unidos.

2. El Acta Orgánica de Puerto Rico.

En cuanto a la Constitución de los Estados Unidos, ya hemos hecho alguna indicación de cómo establece el poder de imponer contribuciones. Pero es forzoso entrar en otros particulares.

La Sección 1 de la Enmienda XIV de la Constitución de los Estados Unidos, es como sigue:

"Sección 1.—Todas las personas nacidas o naturalizadas en los Estados Unidos, sujetas a su jurisdicción, son ciudadanos de los Estados Unidos y del Estado en que residen. Los Estados no podrán dictar ni hacer cumplir ninguna ley que restrinja las prerrogativas o inmunidades de los ciudadanos de los Estados Unidos; tampoco podrán privar a ninguna persona de la vida, la libertad o los bienes de fortuna, sin el debido procedimiento legal, ni negar a nadie en su jurisdicción la igual protección de las leyes."

Copiando en parte ese precepto, que es al mismo tiempo, la más sólida garantía de los derechos primarios del hombre, y la suprema realización legal, de los ideales y principios democráticos, dice la Sección 2 de nuestra Ley Orgánica:

"No se pondrá en vigor en Puerto Rico ninguna ley que privare a una persona de la vida, libertad o propiedad sin el debido procedimiento de ley, o que negare a una persona de dicha isla la protección igual de las leyes."

¿Choca la ley de que tratamos con el principio de igual protección de la ley, o se ajusta a él? Esto es, a nuestro juicio, el problema de más importancia en el caso ante nosotros.

Esta ley, sin duda alguna, trata de distinta manera a los que comercian y trafican en café extranjero y a los que lo hacen en café cultivado y producido en Puerto Rico. Mientras el tráfico y comercio de estos últimos es libre, y se halla exento de impuestos especiales, el de los primeros se halla sujeto al pago de una licencia, y al pago de sellos que se hacen indispensables. Y la diferencia se establece de manera inequívoca, al definir lo que es café extranjero, o sea el café que pudiéramos llamar castigado con los impuestos.

En el caso *Ward* v. *Maryland,* 12 Wall. 418, se trataba de un estatuto que fijaba como requisito para el tráfico de géneros, por los que no fueran productores, la obtención de licencia, de diversos tipos o precios; y en lo que se refería a los no residentes en Maryland, establecía una distinta licencia, por valor de $300 anuales. El tipo más alto de licencia para los comerciantes o traficantes residentes en Maryland, era de $150.

Ward, un ciudadano de los Estados Unidos y de New Jersey, residente en New Jersey, vendió, por muestras, dentro de los límites de Baltimore, arneses de caballo; Ward no tenía la licencia exigida por el estatuto; fué acusado ante una corte de Baltimore; y la defensa fué que el estatuto era anticonstitucional y nulo, defensa que no fué aceptada por la corte, que multó a Ward en $400; condena confirmada por la corte de apelación de Maryland. La Corte Suprema de los Estados Unidos, decidió que el estatuto de Maryland de que se trataba era anticonstitucional y nulo, por hallarse en

pugna con el Artículo IV de la Constitución de los Estados Unidos. De la opinión tomamos los siguientes párrafos:

"Las contribuciones, se admite en esos casos, pueden ser impuestas por un estado sobre todas las ventas efectuadas dentro de él, bien se produzcan los artículos vendidos en el estado tributante, o en cualquier otro, siempre que la contribución sea uniforme; pero la corte al mismo tiempo decide en ambos casos que un impuesto que discrimina en contra de los artículos de los ciudadanos de los otros estados de la Unión sería incompatible con las disposiciones de la Constitución Federal, y que la ley que imponga tal derecho sería inconstitucional y nula. Semejante exacción, no importa el nombre que se le dé, es una contribución sobre los artículos o efectos vendidos, toda vez que el vendedor tiene que aumentar el precio a fin de compensar la suma cargádale por la licencia, la que debe ser pagada por el consumidor o por el vendedor mismo; y en uno u otro caso la suma cargada equivale a una contribución directa sobre los artículos o efectos.

*     *     *     *     *     *     *

"Dése por sentado que los estados puedan imponer contribuciones discriminatorias contra los ciudadanos de otros estados, y pronto se hallará que la facultad concedida al Congreso para reglamentar el comercio entre los estados carece de valor, toda vez que el poder sin freno de los estados para imponer contribuciones resultará ser más eficaz para promover la desigualdad que cualesquiera reglamentaciones que el Congreso pueda adoptar para preservar la igualdad de derechos que tuvo por mira la Constitución entre los ciudadanos de los varios estados. En todas partes se ha admitido que los estados pueden imponer arbitrios, siempre que no sean de alguna forma discriminatorios; mas no debe olvidarse que los ciudadanos de los distintos estados viven bajo una constitución común, que se instauró para establecer la justicia, y que, con las leyes del Congreso y con los tratados celebrados por la autoridad correspondiente, es la ley suprema de la nación. Y esa ley suprema exige igualdad de cargas y prohibe la discriminación en los impuestos estaduales cuando se aplica tal facultad a los ciudadanos de los demás estados. La desigualdad de cargas, así como la falta de uniformidad en la reglamentación del comercio, fué uno de los agravios de que se quejaron los ciudadanos bajo la Confederación; y la nueva Constitución fué adoptada, entre otros motivos, para remediar los defectos del régimen anterior."

En el voto concurrente del Juez Sr. Bradley encontramos lo que sigue:

"Estoy conforme con la opinión de la corte en que la actuación de la Legislatura de Maryland impugnada en este caso discrimina en favor de los residentes y en contra de los no residentes del estado, y que, por tanto, infringe el artículo 4 de la Constitución de los Estados Unidos, y es, por ende, írrita y nula. Pero soy además de opinión de que tal actuación infringe la cláusula de comercio de la Constitución que confiere al Congreso la facultad de reglamentar el comercio entre los varios estados; y lo sería aunque impusiera a los residentes la misma carga por vender artículos mediante muestras que la impuesta a los no residentes. Tal ley impediría, en efecto, que los fabricantes de los estados fabriles vendieran sus productos en otros estados a menos que establecieran en éstos casas de comercio o que vendieran a comerciantes residentes que se decidiesen a enviarles pedidos. Ella es en verdad un derecho de importación fijado por un estado contra otro bajo el nombre de un impuesto. Por tanto, disiento de cualquier manifestación en la opinión de la corte que en forma alguna signifique que tal carga, bien en forma de una contribución o de una penalidad, aunque se imponga en igualdad de condiciones sobre residentes y no residentes, sería constitucional."

Esta lectura nos lleva a considerar, no sólo el precepto constitucional que hemos venido tomando en cuenta, sino también lo que allí se denomina "cláusula comercial" o sea la parte de la Sección 8, Artículo I de la Constitución, que confiere al Congreso de los Estados Unidos el poder para regular el comercio con las naciones extranjeras, el comercio entre los Estados y el con las tribus indias. Y éste es uno de los aspectos bajo que presenta su caso el apelante. Este añade que la Sección 3 de nuestra Ley Orgánica, es de aplicar a su contención. El precepto legal que cita en un *Disponiéndose*, dice así:

"Que no se hará distinción alguna entre los artículos importados de los Estados Unidos o de países extranjeros, y los artículos similares producidos o manufacturados en Puerto Rico."

Puede llegarse con el ilustrado abogado del apelante a la conclusión que él ofrece en su alegato. Esto es: la Sección

8, Artículo I, de la Constitución, ha reservado al Congreso el poder de regular el comercio entre los distintos Estados, y éstos no pueden adoptar o crear legislación alguna que regule o tienda a regular, directa o indirectamente tal comercio. Aparente la finalidad de esas disposiciones legales, no nos es difícil llegar a la conclusión primera del apelante con respecto a que en ella está la prohibición de legislación discriminatoria, diferencial o de diversidad, con respecto a personas o productos de diversos Estados.

Por la Sección 9, Artículo citado, Constitución de los Estados Unidos, se prohibe a los Estados el establecimiento de impuestos o derechos sobre la importación o exportación, excepto en lo que pueda ser "absolutamente necesario para ejecutar sus leyes de inspección." Pero, esto no quiere decir que las leyes de inspección puedan ser discriminatorias, ni convertirse en leyes de imposición de derechos o tributos a la exportación o la importación. Como ha dicho la Corte Suprema de los Estados Unidos en su decisión en el caso *Wagner* v. *City of Covington, supra,* el nombre que se dé a la imposición no es lo importante, sino el efecto de la misma.

De las autoridades que cita el apelante para sostener su primera proposición, copiamos, haciéndola nuestra, la del caso *Minnesota* v. *Barber,* 136 U. S. 313, en donde se dijo:

"Un impuesto discriminatorio fijado por un estado, que sea desventajoso para los productos de otros estados al ser introducidos en aquél, es, en efecto, una reglamentación que restringe las relaciones comerciales de los estados y como tal es una usurpación de los poderes conferidos al Congreso por la Constitución de los Estados Unidos."

El estatuto de Minnesota de que en este caso se trataba era uno que proveía para la inspección del ganado que había de sacrificarse para consumo público. En él se establece la inspección del ganado, y las condiciones en que ha de llevarse a cabo. Como se dice en la decisión:

"La presunción de que este estatuto fué promulgado de buena

fe, para el fin expresado en su título, o sea, para proteger la salud de los ciudadanos de Minnesota, no puede regir la determinación final de la cuestión de si es contrario a la Constitución de los Estados Unidos. Puede que no sea el propósito de la Legislatura infringir las disposiciones de ese instrumento, y sin embargo, un estatuto adoptado por ella en forma de ley puede, por sus efectos necesarios, destruir los derechos otorgados o garantizados por la Constitución. En tales casos, las cortes deben sostener la ley suprema de la nación, declarando el estatuto inconstitucional y nulo. Este principio de interpretación constitucional ha sido enunciado frecuentemente por este Tribunal. En el caso de *Henderson & C.* v. *New York & C.*, 92 U. S. 259, 268 en que un estatuto de Nueva York que imponía condiciones gravosas y casi imposibles de cumplir sobre el desembarque de pasajeros de buques dedicados al comercio con el extranjero, fué declarado inconstitucional y nulo por ser una reglamentación de tal comercio, la corte dijo que: 'No importa la fraseología en que se redacte un estatuto, su fin debe ser determinado por su efecto natural y razonable.' En *People* v. *Compagnie Générale Transatlantique*, 107 U. S. 59, 63, en que la cuestión envuelta era la validez de un estatuto del mismo estado, que trataba de sostenerse como una ley de inspección autorizada por la sección 10 del artículo I de la Constitución, y así se designó en su título, se dijo: 'Un estado no puede calificar una ley destinada a levantar fondos para sostener a los pordioseros, para investigar o impedir el crimen, para prevenir las enfermedades y curar a los enfermos, como una ley de inspección, dentro del significado constitucional de esa palabra, designándola así en el título.' Así, en el caso de *Soon Hing* v. *Crowley*, 113 U. S. 703, 710, se dijo: 'Es regla general, en lo que atañe a las disposiciones de todos los cuerpos legislativos, que los tribunales no pueden penetrar en los designios de los legisladores al aprobarlas, salvo tal cual puedan inferirse de la propia faz de las leyes o colegirse de sus efectos, considerados en relación con las condiciones del país y la legislación vigente. Los designios de los legisladores, considerados como los fines que tuvieron en mente, siempre se presumirá que son para cumplir aquello que surge como efecto natural y razonable de sus actuaciones.' En *Mugler* v. *Kansas*, 123 U. S. 623, 661, la corte, dspués de decir que toda presunción posible es en favor de la validez de un estatuto, manifestó que el poder judicial debe obedecer la Constitución más bien que a la rama legislativa del gobierno, y que debe, bajo su propia responsabilidad, determinar si en un caso en particular los límites de la Constitución han sido traspasados. Se dijo además: 'Por tanto, si un estatuto que se supone haber sido

promulgado para proteger la salud, la moral o seguridad públicas no tiene relación real o substancial con tales fines o es una invasión palpable de los derechos garantizados por la ley fundamental, las cortes están en el deber de así declararlo, dando de ese modo efecto a la Constitución.' Por la autoridad de dichos casos, y de otros que podrían citarse, es nuestro deber inquirir, con respecto al estatuto que tenemos ante nos, no sólo si existe una relación real o substancial entre los fines manifiestos y los medios de la legislación diseñados para realizar esos fines, sino también si por sus resultados necesarios o naturales, menoscaba o destruye derechos garantizados por la Constitución de los Estados Unidos.''

La Corte Suprema llegó a la conclusión de que tal estatuto, por requerir que para ser vendida en Minnesota carne de buey, ternera, carnero, cordero o cerdo, destinada a alimento humano, los animales de que procediera tenían que ser inspeccionados en Minnesota, antes de ser sacrificados, era en violación de la Constitución de los Estados Unidos. En la opinión se citan los casos de *Woodruff* v. *Parham,* 8 Wall. 123, 140, *Hinson* v. *Lott,* 8 Wall. 148, *Wellton* v. *Missouri,* 91 U. S. 275, *Railroad Co.* v. *Husen,* 95 U. S. 465, y otros, igualmente importantes.

La segunda proposición del apelante o sea que toda ley que impone una licencia para comerciar con un producto extranjero, y no exige la misma licencia para comerciar con el producto nativo de la misma clase, es discriminatoria, y, por ello, anticonstitucional, es, a nuestro juicio, de acuerdo con la Constitución de los Estados Unidos y con la jurisprudencia, correcta.

El caso que cita el apelante, *Wellton* v. *Missouri,* 91 U. S. 275 (98 U. S. en el alegato) contiene la misma doctrina legal que venimos exponiendo. Como hemos dicho, aparece citado en *Minnesota* v. *Barber.*

La doctrina expuesta tiene el carácter de indiscutible después de la decisión de la Corte Suprema en *Wright* v. *Wright,* 141 U. S. 62. En este caso se trató un estatuto por el que se exigía que toda harina que se importara o trajera

al Estado de Virginia, para ser en él vendida, debería ser revisada y marcada con el sello de inspección de Virginia. En la opinión se cita la definición del Chief Justice Marshall en *Gibbons* v. *Ogden*, 9 Wheat 1, de lo que son leyes de inspección, así:

"El objeto de las leyes de inspección es mejorar la calidad de los artículos producidos por la industria de un país; hacerlos apropiados para la exportación, o acaso para el uso doméstico."

Y se dice, por la corte:

"La ley de que se trata es discriminatoria, y exige la inspección de harina traída de otros estados, cuando tal inspección no se requiere para la harina fabricada en Virginia. Este aspecto del caso lo trae directamente dentro del principio de *Brimmer* v. *Rebman*, 138 U. S. 78, decidido en el presente término. La ley discutida en ese caso fué otro estatuto de Virginia haciendo ilegal la venta, dentro del estado, de cualquier carne fresca (carne de vaca, de ternera y de carnero) procedente de carnicerías que estuvieran a cien millas, o más, del sitio en que fuera ofrecida en venta, hasta que hubiera sido inspeccionada y aprobada con arreglo a la ley. El Juez Asociado Sr. Harlan, como juez ponente, dijo: 'Indudablemente, un estado puede establecer reglas para la protección de su pueblo contra la venta de carnes malsanas, siempre que tales reglas no estén en conflicto con los poderes conferidos por la Constitución al Congreso, o no infrinjan derechos otorgados o garantizados por ese instrumento. Pero no puede, so color de ejercer sus poderes de policía, o de aprobar leyes de inspección, hacer discriminaciones en contra de los productos e industrias de algunos de los estados en favor de los productos e industrias del propio u otros estados. El dueño de las carnes de que se trata, aunque fueran de animales sacrificados en Illinois, tenía derecho, al amparo de la Constitución, a competir en los mercados de Virginia sobre bases de igualdad con los dueños de carnes similares de animales sacrificados en Virginia o en cualquier punto dentro de un radio de cien millas del sitio de la venta. Cualquier regla local que por sus términos o por sus consecuencias necesarias niegue esta igualdad en los mercados de un estado es, cuando se aplica al pueblo y a los productos o industrias de otros estados, una carga directa sobre el comerciante entre los estados, y, ergo, nula. Wellton v. Missouri, 91 U. S. 275, 281; Railroad Co. v. Husen, 95 U. S. 465; Minnesota v. Barber, 136 U. S. 313, 319.' El caso

de Brimmer v. Rebman se decidió de acuerdo con estos puntos de vista, declarándose inconstitucional y nula la ley en cuestión.''

Evidentemente, y bajo cualquier nombre que se le quiera dar, la Ley No. 19 de 19 de abril de 1928, es como de su contexto aparece, y como de su efecto u operación resulta una ley para protección del café de Puerto Rico contra competencia del café que allí se llama extranjero.

La Ley del Congreso de los Estados Unidos permitiendo a la Legislatura de Puerto Rico la creación de un derecho de importación sobre el café extranjero, llena los fines de protección, con la diferencia de que el producto de tal derecho de importación se invierte en beneficio del pueblo en general.

Del estudio de la precedente jurisprudencia, venimos a la consideración del nuevo aspecto en que por el apelante se presenta la cuestión de constitucionalidad de la ley. En los casos *Nazario* v. *Gallardo, supra,* la cuestión no fué la misma, ni se resolvió, como ahora, si aun tratándose de una ley de inspección, podía ésta ser discriminatoria. Este es el nuevo aspecto del problema.

Aunque se trate de una ley de inspección, los preceptos constitucionales que garantizan la igual protección de las leyes, y la libertad e igualdad del comercio entre los Estados, dejando la regulación de éste al Congreso, no pueden ser desconocidos o violados por la legislación de cualquier Estado; lo que es aplicable, como limitación, a las Legislaturas de territorios y posesiones. Esta es, en verdad, la proposición legal, que resolvemos de acuerdo con el apelante.

La Ley No. 19, de 19 de abril de 1928, es anticonstitucional y nula. Por lo que *debe revocarse la resolución apelada, y declararse con lugar la petición de hábeas corpus de Salvador E. Suazo, decretándose la libertad del peticionario y la cancelación de la fianza.*

El Juez Asociado Señor Hutchison está conforme con el resultado.

OPINIÓN DISIDENTE DEL JUEZ PRESIDENTE SR. DEL TORO.

Aunque reconozco la fuerza de los argumentos en contrario, a mi juicio la ley número 19, de 1928, para reglamentar la venta de café extranjero que se impugna, no es anticonstitucional, porque sólo impone un derecho de inspección y la fijación de ciertas estampillas a fin de que el consumidor sepa que lo que compra es café extranjero y no de la Isla. Creemos que exigir que el artículo extranjero que se venda en un estado o territorio de la Unión lo sea como tal, no es coartar el comercio entre estados. Tendría que demostrarse que el derecho cobrado a fin de poner en práctica la medida, por su magnitud o por cualquiera otra circunstancia, revelaba la intención de prohibir u obstaculizar y de hecho obstaculizaba o prohibía el comercio entre estados, para declarar la ley anticonstitucional, y aquí, a mi juicio, no se ha demostrado tal cosa.