### 3479.  CHARLESTON & WESTERN CAROLINA RAILWAY CO. v. ANCHORS.

1. Before the act of Congress of April 22, 1908 (35 Stat. 65, c. 149, U. S.
Comp. St. Supp. 1909, p. 1171), known as the Federal "employer's lia-
bility act," applies to an action for damages brought against a rail-
road company by one of its employees for injuries received in the serv-
ice of the company, it must appear, (1) that the railroad company is
an interstate carrier; (2) that, as to the transaction through which

the injury occurred, it was at the time engaged in interstate commerce; and (3) that the injured employee was at the time engaged in interstate commerce.

2. Where the foreman of a gang of railroad track hands is injured by being struck in the eye by a particle of iron put in flight by a negligent stroke of a hammer in the hands of one of the men working under him, and it appears that the business on hand at the time of the injury was the taking up and relaying of one of the rails of the track, it is held that the parties were not engaged in interstate commerce, notwithstanding that the track in question may have been devoted to the passage of interstate, as well as intrastate, trains, and notwithstanding that the railroad, in a general sense, may have been an interstate carrier. To such a transaction the Federal statute does not apply.

DECIDED JANUARY 15, 1912.

Action for damages; from city court of Richmond county—Judge W. F. Eve. May 24, 1911.

Anchors sued the Charleston & Western Carolina Railway Company for the loss of an eye, resulting from alleged acts of negligence as set out in the petition. The case came to this court on exceptions to the overruling of a demurrer to the petition.

The plaintiff was employed by the defendant as foreman of a gang of track hands, working on the track of said road near Mc-Cormick, S. C., over which the defendant operated trains back and forth between Georgia and South Carolina. One of the track hands working under him struck the blow from which the injury to his eye resulted. Paragraph 2 of the petition reads as follows: "Said defendant is a common carrier, owning a line of railroad between the city of Augusta in the State of Georgia, and the city of Spartanburg in the State of South Carolina, and, on the date of the injury herein complained of, was engaging in commerce between the State of Georgia and the State of South Carolina and between the several States, and the injury hereinafter complained of was sustained by plaintiff while he was employed by said defendant carrier in said interstate commerce, and defendant is liable in damages therefor under the act of Congress of April 22, 1908, which declares that such an employee may recover from such a common carrier, for 'injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier; or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, track, road-bed, works, boats, wharves, or other equipment.' " It is further stated that the work in which the plaintiff and the other servant of the

company were engaged was the taking up and replacing of one of the rails of the track, and that the work was being rushed, so that an interstate train could pass on schedule. The demurrer was upon various grounds, the chief ground insisted upon being that the petition set out no cause of action under the said act of Congress of 1908, because the plaintiff, being a track hand engaged in repairing a track in South Carolina at the time of the injury, was not employed in interstate commerce within the meaning of that act; and that the defendant, as to the transaction in question, was not so engaged. The demurrer was overruled upon all the grounds.

*William K. Miller,* for plaintiff in error.

*William H. Fleming,* contra.

POWELL, J. (After stating the foregoing facts.)

The sole question involved is whether the act of Congress of April 22, 1908, known as the Federal "employer's liability act," applies to this transaction. That statute, by its terms, relates only to liability of carriers by railroad " while engaged in commerce between any of the several States" to persons "while employed by such carrier in such commerce." It will be called to mind that the prior act of Congress on the same subject (the act of 1906) was declared unconstitutional by the Supreme Court of the United States in Howard *v.* Illinois Central R. Co., 207 U. S. 463 (52 L. ed. 297), on the ground that it applied to all carriers who were generally engaged in interstate commerce, as to all employees, whether the carrier and the employee were at the time of the injury actually engaged with commerce of that character or not. The present law was enacted with its limitations with the special object in view of cutting out the constitutional objection for which the prior law had been declared invalid. The present law emphasizes three things which must concur before its provisions are applicable: (1) the railroad company in question must engage in interstate commerce; (2) it must at the time of the injury in question be engaging in that character of commerce, as contradistinguished from such purely local matters as it may also engage in; (3) the injured servant must also at the time of receiving his injury be engaging in interstate commerce. That the carrier in this case was generally engaged in interstate commerce is not in question. The remaining questions are whether, at the time the injury complained of was

received, it was engaging in interstate commerce, and whether the injured employee was engaging in that character of commerce at that time. To narrow the point a little more, the concrete question is whether the work of repairing a defective rail in a track over which a railroad company carries on its transportation, both local and interstate, is of itself an act of engaging in interstate commerce.

It is very difficult to impose the limitations of a definition upon the word "commerce" as used in the Federal constitution. How this term, which originally was considered as almost synonymous in meaning with the word "trade," has been enlarged so as to include contracts, transportation, ways, means, and agencies, and even instrumentalities by which commercial intercommunications are carried on, is a matter of legal history. Still, with all of its enlargement of meaning, the word "commerce" has its limitations, and there are some things which, though touching the field of commercial operation, do not enter into it in such a way as to become of themselves a part of the commerce. The insuring of articles intended for interstate transportation is a matter which touches interstate commerce, but is not commerce within the purview of the constitution. Paul v. Virginia, 75 U. S. (8 Wall.) 168 (19 L. ed. 973); Hooper v. California, 155 U. S. 49 (39 L. ed. 297); Nutting v. Moss, 183 U. S. 553 (46 L. ed. 634). To manufacture goods with the intention of devoting them to interstate commerce is not interstate commerce. U. S. v. Knight Co., 156 U. S. 1 (39 L. ed. 325). In the case of Kidd v. Pearson, 128 U. S. 1 (32 L. ed. 346), in which it is held that a State may prohibit the manufacture of intoxicating liquors within its borders, notwithstanding that the manufacturer intends to use the liquors only for exportation beyond the borders of the State, the court, speaking through Mr. Justice Lamar, draws the distinction between manufacture and commerce thus: "No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufactures and commerce. Manufacture is transformation—the fashioning of raw materials into a change of form for use. The functions of commerce are different. The buying and selling and the transportation incidental thereto constitute commerce; and the regulation of commerce in the constitutional sense embraces the regulation at least of such transportation. The

legal definition of the term as given by this court in County of Mobile *v.* Kimball, 102 U. S. 691, 702 [26 L. ed. 238, 241], is as follows: 'Commerce with foreign Nations and among the States, strictly considered, consists in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities.' If it be held that the term includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that Congress would be invested, to the exclusion of the States, with the power to regulate, not only manufactures, but also agriculture, horticulture, stock raising, domestic fisheries, mining—in short, every branch of human industry. For is there one of them that does not contemplate, more or less clearly, an interstate or foreign market? Does not the wheat grower of the Northwest, and the cotton planter of the South, plant, cultivate, and harvest his crop with an eye on the prices at Liverpool, New York, and Chicago? The power being vested in Congress and denied to the State, it would follow as an inevitable result that the duty would devolve on Congress to regulate all of these delicate, multiform, and vital interests—interests which in their nature are, and must be, local in all the details of their successful management." Again, in Coe *v.* Errol, 116 U. S. 517 (29 L. ed. 715), the court held that logs cut in the woods and brought to the landing for the purpose of being transported in interstate commerce did not thereby become a subject of interstate commerce.

From these and other cases of the Supreme Court of the United States along the same line, it is clear that a distinction is observed between preparing to engage in interstate commerce and in engaging in interstate commerce. As was pointed out by the United States Supreme Court in Smith *v.* Alabama, 124 U. S. 465, 481 (31 L. ed. 508), "it is to be remembered that railroads are not natural highways of trade and commerce; they are artificial creations; they are constructed within the territorial limits of the State and by the authority of its laws, and ordinarily by means of corporations exercising their franchises by limited grants from the State." And, as the opinion of the court in that case goes on to point out, there are many matters relating to the preparation of a

railroad company to engage in interstate commerce which are of a purely local nature, and are not of themselves a part of interstate commerce. From the reasoning and from the illustrations given in the case of Howard *v.* Illinois Central R. Co., supra, in which the former "employer's liability act" was declared unconstitutional, it is plain that the court had in mind that there were necessarily a number of activities which an interstate railroad might engage in which would not constitute engaging in interstate commerce. It is true that, in a more or less remote sense, every act performed by an employee for a carrier that engages indiscriminately in local and interstate commerce tends to promote the latter form of commerce. The porter who cleans the cuspidors in the general offices of the company, for the comfort and convenience of the officers who direct the movement of the trains as they pass from State to State and the other great commercial activities of the carrier, is, in a certain sense, engaged in carrying on that great commerce, but we do not believe that this menial employee, in his strictly local duties, is within the purview of the act of Congress in question; and we believe that the connection between the services to be performed and the commerce itself must be closer than that.

Just here let us make this point clearer: that wherever this Federal statute applies, all State laws give way and employer and employee alike are bound by its terms. Considering it in its operation throughout the entire United States and noticing its effect upon the local jurisprudence of the various States, it may be seen that in some States, as to some transactions, and as to some phases of what is commonly known as the master and servant law, it gives the employee a benefit, while in other States, or as to other transactions, or as to other phases of the master and servant law, it gives the employer the benefit. Whatever it takes from one side it gives to the other, and vice versa. For instance, in the State of South Carolina, where this very injury arose, the Federal act is more beneficial to the employee in this particular instance than the State law is, because the defense of fellow service is, by the Federal act, abolished as to the under-servant who inflicted this injury upon his foreman, whereas, under the South Carolina statute, the railroad company could have pleaded the doctrine of fellow servant, to exempt itself in such a case. And yet in most respects the South Carolina statute on this general subject is more favorable to the

servant than it is to the master.   So when the court proceeds to lay down the rule that this or that service performed by an employee for a railroad company constitutes engaging in interstate commerce, no person can thereafter enter into the service of an interstate carrier and perform that service for it without surrendering whatever particular benefits may be given him by the State law, so far as they are not also given by the Federal law.   We mention this in response to the argument presented by able counsel for the defendant in error, that this Federal statute is one of those beneficent and progressive acts of legislation which should be given the widest possible legal scope, and that the benefit of every reasonable doubt should be given in favor of maintaining jurisdiction under it.   Personally, we give accord to the sentiment that the Federal act is, in most respects, a wise and beneficent piece of legislation, and a fair and just statute; but that is a matter with which we have no concern at all.   All valid statutes enacted by Congress within the scope of its powers are, so far as we as judges are concerned, wise and beneficent and just acts of legislation.   On the other hand, every valid State statute is to be considered to be entitled to the same respect and judicial approval, so far as it is enacted within the scope of the State's powers.

After carefully considering the question, and with no other end in view than to give to the act of Congress just such scope as it is legally entitled to, without any prejudice for or against the legislation as such, we can not see how the act of repairing a broken rail in a railroad track is engaging in commerce at all, nor how the repairing of a part of the physical properties of a railroad, which are in their very nature permanently fixed within the limits of the State, can be regarded as an interstate transaction at all.   To our minds neither the servant who struck the blow nor the servant whose eye was injured through the blow's being struck was engaged in interstate commerce, since the whole object of striking the blow was merely to drive a spike to hold in place a rail, that this defendant might have a railroad track upon which it could thereafter, if it so desired, engage in commerce, either interstate or intrastate.   If the distinction between preparing to engage in commerce and the act of actually engaging in it is to be observed, this transaction falls squarely within the domain of preparation.

We are aware that the courts, so far as they have passed upon

this and cognate questions, have been widely divided in opinion. To support the view that the Federal statute would apply in such cases, see Zikos *v.* Oregon R. & N. Co., (C. C.) 179 Fed. 893; Colasurdo *v.* Ry. Co., (C. C.) 180 Fed. 832 (recently affirmed by the Court of Appeals of the second circuit, 191 Fed.). On the contrary, see Taylor *v.* Sou. Ry. Co. (by Judge Newman of the United States court of the northern district of Georgia), 178 Fed. 380. Indeed, the conflict in judicial views on the question is such that notwithstanding what decisions may be rendered in the meantime, the question can be treated as an open one until the Supreme Court of the United States itself decides it, as it probably will do at some early date. In the meantime the judgment is　　　　*Reversed.*