**FLEMING v. ATLANTIC CO.**

No. 2274 C. A.

District Court, N. D. Georgia,
Atlanta Division.

June 25, 1941.

On Rehearing Sept. 19, 1941.

656

Gerard D. Reilly, Sol., Irving J. Levy, Asst. Sol. in charge of litigation, Abner Brodie, Edward J. Fruchtman, Erwin B. Ellmann, and Norman S. Altman, all of Washington, D. C., and George A. Downing, Regional Atty., of Atlanta, Ga., for plaintiff.

Spalding, Sibley, Troutman & Brock, Wm. K. Meadow, and W. J. Hobbs, all of Atlanta, Ga., for defendant.

RUSSELL, District Judge.

Philip B. Fleming, as Administrator of the Wage and Hour Division of the United States Department of Labor, filed a complaint seeking to enjoin the Atlantic Company from violating Sections 15(a) (1), 15 (a) (2), and 15(a) (5) of the Fair Labor Standards Act of 1938, U.S.C.A., Title 29, Sec. 201 et seq.

From the allegations of the petition and the evidence introduced in support thereof, it appears that the defendant is a Georgia corporation, engaged in extensive business which falls into three general types, viz.: (1) the operation of a brewery for the production and sale of beer; (2) the operation of a cold storage warehouse; and (3) the manufacture of ice which is sold locally for refrigeration, and a considerable portion of which is furnished under contract to interstate railroads and Fruit Growers Express and used in the refrigeration of shipments of perishable commodities.

In addition to the question of the application of the Act to the operations and employees in each branch of the business of the defendant, upon the trial the question arose as to the validity of an arrangement referred to as "employment cards" relating to salaried employees of the defendant.

After the conclusion of the trial and by motion filed within the time permitted for the filing of briefs, defendant attacks the constitutionality of the Fair Labor Standards Act, and especially Sections 6 and 7 thereof, contending that the manufacture of goods with the intent to ship them in interstate commerce is not within the regulatory power of Congress; that Congress is without the power to regulate wages and hours in interstate commerce; that Section 7 of the Act is not a regulation of hours or wages but is an attempt to create additional jobs; that the Act is arbitrary and unequal in its application because of the exceptions contained in Section 13 thereof, and that Section 7 is arbitrary and invalid because of the nature of the exceptions contained therein.

This motion was filed prior to the decisions of the Supreme Court in the cases of United States v. Darby Lumber Company, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430, and Opp Cotton Mills, Inc. v. Administrator of Wage and Hour Division of Department of Labor, 312 U.S. 126, 61 S.Ct. 524, 85 L.Ed. 624. The principles ruled in the decisions in these cases amply sustain the legality of the Act against the objections urged and no good purpose could be served by a further discussion, and this motion of defendant is overruled.

The case was tried and has been argued in the briefs with separate consideration to each branch of the business, and in the interest of clarity will be so considered here.

I. The Production and Sale of Beer.

No question of the applicability of the Act to the brewery business of the defendant is presented, for it is conceded by the defendant that a substantial portion of its output of beer and ale is sold in interstate commerce, but defendant contends that it has been paying, and is now paying, to its employees engaged in the production of beer the wages required by the Act.

With reference to this phase of defendant's business, the only material question presented is whether certain employees who it is contended are not directly engaged in the production of beer, such as specified clerical employees and mechanics engaged in the maintenance and repair of the machinery, are engaged in the produc-

tion of beer. As to these, it is clear from the evidence that the services of the clerical help and of the maintenance and repairmen are essential to the production and shipment of beer. Therefore, under the terms of the Act such employees are employed in producing, handling, and working on such goods, and in occupations necessary to the production thereof, and in their employment defendant is required to comply with the provisions of the Act.

From the evidence, it is clear that without the services of the maintenance carpenters and mechanics the production could not be carried on, and it is clear that the services of the clerical help and engineers are so intimately and directly connected with the production and sale of the beer as to be an essential part thereof.

 Regardless of whether the failure to keep the records required by the Act was due to the contention in good faith that such employees were not covered by the terms of the Act, the plaintiff has established that the records kept by the defendant and the payment of wages and over time compensation as to such employees was not in accord with the provisions of the Act, and constitute a violation thereof. Violation of Section 15(a) (1) by shipment follows.

## II. Cold Storage Warehouse.

In the operation by the defendant of its cold storage warehouse, shipments of commodities requiring refrigeration are constantly received, stored, and re-shipped or delivered. It is an extensive business. The warehouse is adjacent to the railroad yards and convenient to carriers by motor truck. From 70% to 90% of the incoming shipments of merchandise originate from points outside of Georgia, and more than 25% of shipments received are subsequently re-shipped to points outside of Georgia. Frequently the defendant re-ships for distribution upon order of the original consignor, itself paying the freight or carrier charges, which are included in the storage charges.

Upon certain items, directions for re-shipment are received prior to the actual receipt of the goods, and interstate shipments of such goods are made upon their arrival. Upon a weekly average, the equivalent of 10 railroad cars are unloaded at defendant's railroad platform, and there is a daily and continuous flow of goods into and from the cold storage warehouse by trucks.

 It is unnecessary to further detail the character of defendant's cold storage warehouse operations, for it is conceded that the unloading and storage of interstate shipments and the re-loading of the interstate shipments are covered by the Act. The defendant asserts that the protection and proper refrigeration of the goods while on storage is not within the terms of the Act. However, it is apparent from the evidence that there is no real separation of activities, and the services of those employed in the warehouse, between what is admittedly interstate business and intrastate transactions.

 The business of a cold storage warehouse certainly as well includes the proper refrigeration and care of goods stored as it does the operations by which such goods are received, stored, shipped and delivered. Each act and service is essential to completion of the entire cold storage warehousing which defendant carries on. The stoppage by storage of interstate shipments intended afterwards to go forward in continuation of such commerce does not remove such goods from commerce. See Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229; McGoldrick v. Gulf Oil Corp., 309 U.S. 414, 60 S.Ct. 664, 84 L.Ed. 840; Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092; Southern Pacific Terminal Co. v. Interstate Commerce Comm., 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310; Texas v. Anderson Clayton & Co., 5 Cir., 92 F.2d 104.

The same labor and clerical help conducts both phases of defendant's cold storage business in all its aspects, and each of them are employed and help in carrying on the commerce of the defendant. This commerce is the receipt, unloading, storage, the necessary refrigeration, re-shipment and delivery of goods. The business operations of the defendant are such that it is impossible to determine what proportion of the services of employees is devoted to interstate commerce and to local operations. The business and plant need only be considered in its entirety, and the carpenters and maintenance men are essential to the conduct of that portion of the defendant's business which is interstate, and the fact that the repair of an elevator or a door, or services necessary in furnishing refrigeration, likewise facilitate the local business of the defendant, does not remove the activities of such employees from the realm of interstate commerce, to which such services equally relate.

■ In other words, where the business of the employer is substantially interstate, as well as intrastate, and the clerical help, maintenance men and laborers indiscriminately perform services essential to the carrying on of both classes of business, they are engaged in commerce within the meaning of the Act. The activities of each are required in the carrying on of the interstate business of the defendant.

■ The applicability of the Act to such employees being established, the evidence shows violations by the defendant of Sections 15(a) (2) and 15(a) (5).

III. Production of Ice for Sale to Common Carrier Railroads and Fruit Growers Express for Refrigeration of Shipments of Perishable Commodities.

In the conduct of its ice manufacture, the defendant operates several plants in the City of Atlanta and regularly produces ice at its central plant, Brookwood, Decatur, East Atlanta and West End plants for the purpose of fulfilling its contracts for the sale and delivery to the Fruit Growers Express and various railroads of ice for use in refrigerating railroad refrigerator freight cars. It occasionally produces ice for such purpose at its Kirkwood, Nelson Street, Ridge Avenue, North Avenue and Number Seven, Decatur Street, plants.

It appears that at all the plants at certain periods, due to mechanical conditions which cannot be controlled, a portion of the output comes out as what is known as "white ice" which cannot be sold commercially, and which it is not intended to produce. I conclude from the evidence that as to this portion of the ice, that it is not produced for any purpose but that its production cannot be avoided in the general production of ice.

In addition to sales to the railroads and to Fruit Growers Express, considerable sales of ice, both in blocks and ground, are made to interstate motor truck carriers, much of this being blown into the shipment by a special machine used by the defendant. Defendant, under contract with the Fruit Growers Express, daily sells and delivers large quantities of ice to it for use in the icing of freight refrigerator cars carrying perishable commodities, and it is sold to this Company for the purpose of enabling it to carry out its contract with the railroads to furnish them the initial icing and re-icing of freight refrigerator cars moving in interstate commerce.

The defendant maintains and operates in Atlanta at two places car-icing platforms, from which its employees place ice directly into the bunkers of refrigerator cars, and also ship ice in car-load quantities to icing platforms maintained by the Fruit Growers Express at three locations adjacent to freight tracks where employees of the Fruit Growers Express Company place such ice into refrigerator car bunkers.

During the peach season, in June, July and August of each year, defendant also ships ice in car-load quantities to Fruit Growers Express at four places in Georgia, and this ice is likewise used by the Company in the icing of refrigerator freight cars for interstate shipment. The cars iced or re-iced at the various locations in Georgia are not, except in unusual circumstances, again re-iced within the State of Georgia, the re-icing being generally done in adjoining States. A portion of the output of defendant's ice plants is sold to various common carriers in Atlanta for use in dining cars and water coolers in passenger trains.

The business of furnishing ice for refrigerator freight cars is quite substantial, the evidence showing that between October 24, 1938 and August 1, 1940 defendant sold and delivered to the Fruit Growers Express at its icing platforms in Atlanta for the icing of refrigerator cars 17,438 tons of ice. During this period the Fruit Growers Express Company iced and re-iced 9,538 refrigerator freight cars. During this period defendant sold and shipped to the Fruit Growers Express Company at three points in Georgia for use in the icing and re-icing of such cars 29,941 tons of ice. Defendant itself iced and re-iced during such period at two of its platforms 13,574 refrigerator cars with 23,580 tons of ice, and iced or re-iced on team tracks of various railroads 117 refrigerator cars with 487 tons of ice.

In the production of the ice so sold and used, numerous employees are engaged. Their services are necessary to its production, and included in these are maintenance men employed in the repair and upkeep of producing machines. As stated with reference to the brewery, it is apparent that all those employed at the plants which produce ice for the sales to the Fruit Growers Express and the railroads and interstate motor truck carriers are engaged in the production of ice, or some process or occupation necessary to its production, and the removal and delivery of the ice from these plants to the icing plat-

forms or trucks, and its placing in the freight cars or the bunkers of the refrigerator cars, is an essential part of the production and sale of the ice for the refrigeration purposes as stated.

After the actual production of the ice, it is necessary that it be handled and transported and delivered in order to carry on the business of the defendant with relation to this ice. Defendant strenuously insists that the sales are local transactions, entirely concluded within the State of Georgia, and that the ice is never shipped or transported in commerce. The defendant's position is that the ice is a consumable commodity, carried along with the shipment, but not itself a shipment, and compares the ice to the coal in the tender of the locomotive. It is conceded that such ice is essential to the carrying on of such commerce, but the contention is made that the Fair Labor Standards Act does not purport to reach activities which are not themselves commerce, but which only "affect" commerce. The plaintiff contends that the sales under the circumstances disclosed are transactions in interstate commerce, and therefore the question of the reach of the Act to activities which "affect" commerce is not here material.

Thus the question presented is as to the scope of the words "production of goods for commerce." Do these words relate only to goods which are themselves articles of commerce and so shipped in commerce, or are they broad enough to include goods which are essential to the carrying on of commerce and transportation in commerce, and are so intimately connected therewith as to be a part of transportation and commerce.

Under the evidence, the ice, though portions are carried out of the State while being used or consumed, is never shipped or transported in commerce as an article of commerce for subsequent sale in commerce, but its production, sale and use (carrying or transportation) is essential to the carrying on of commerce, and without it an important and material part of interstate commerce and transportation could not be carried on. The fruits and vegetables of Florida, the peaches of Georgia, the meats packed in Chicago, and numerous other perishable commodities could not move interstate without the refrigeration afforded by such ice.

It is established by the evidence that there is no substantial competition between interstate ice manufacturers. So far as ice as an article of commerce is concerned, it is clear from the evidence that there is no substantial competition between interstate ice manufacturers. However, as to car icing, it is likewise clear that it is an interstate business to the extent that cars and shipments iced in Georgia are not thereafter re-iced, except in unusual instances, until the shipments, preserved and protected by the Georgia ice, have travelled from Georgia to an adjoining State. Apparently in such State the operation is repeated and the shipments after successive re-icing operations in the States through which they move reach their destinations.

Thus while none of the Georgia ice may reach the ultimate destination, it has played an all-important part in the carrying on of the interstate shipments. In these circumstances the question of competition of goods produced in one State with those manufactured in another is not necessarily the sole determining test of coverage under the Fair Labor Standards Act. Even so, the amount of ice bunkered in Georgia doubtless affects the amount bunkered in South Carolina or Tennessee.

With the constitutional questions removed, no question is presented as to the power of Congress to control the production and sale of ice under the circumstances now disclosed. It is, however, most strenuously urged that such activity is not included within the terms of the Act. So the determinative question, not free from difficulty of solution, is whether the business and production of ice which is essential to the carrying on of interstate commerce comes within the terms and intent of the Act, and whether employees delivering such ice are engaged in commerce.

The Act itself contains direct expression of its policy, and Supreme Judicial interpretation of the evils sought to be remedied has been declared. United States v. Darby Lumber Co., supra, and Opp Cotton Mills, Inc. v. Administrator of Wage and Hour Division of Department of Labor, supra. However, in the light of the present facts, some observations of pertinent provisions of the Act may give support to the conclusion here reached.

The policy of the Fair Labor Standards Act, to be accomplished by exercise of the Constitutional Congressional "power to regulate commerce among the several States," is the correction and elimination

of labor conditions in the designated industries which (1) cause "commerce and the channels and instrumentalities of commerce to be used to spread" such conditions among the several States; (2) burdens commerce and the free flow of goods in commerce; (3) leads to labor disputes which burden commerce and its flow; and (4) interferes with the orderly and fair marketing of goods in commerce. 29 U.S.C.A. § 202.

Thus Congress determined that statutory designated substandard labor conditions which produced either of the found effects sought to be corrected and eliminated should be regulated by the exercise of the commerce power. What is the fair extent of power exercised by the provisions of the Act? Manifestly, no fair determination of the character, extent and nature of the goods included can be had solely from the segregated words "production of goods for commerce."

■ The entire statutory scheme must be examined. "Produced" is so defined to include every conceivable connotation of the word and some not heretofore adopted. "Goods" is given its widest meaning. 29 U.S.C.A. § 203. "For," though not defined, is doubtless employed in its most general sense, indicating that in consideration of which, in view of which, or with reference to which, anything is done or takes place, or as indicating the end to which anything acts, serves or is done, "as a preparation towards or in view of; having ·as goal or object; * * * to serve as part of; to supply the need of; in order to effect." Webster's New International Dictionary.

After lengthy and serious consideration, the meaning and extent of the word "for" looms large in determining in one's mind the application of the Act intended by Congress. In other words, whether "for commerce" is restricted only to articles produced to be sold, shipped and transported "in commerce," or whether the words mean "produced" for the purpose of carrying on commerce, "or produced in consideration of, to serve as part of, or to supply the need of, or in order to effect commerce."

■ "Commerce," the remaining word of this "critical" phrase, as affects this case, is defined as "trade, commerce, transportation," etc., among the several States, or from any State to any place outside thereof. 29 U.S.C.A. § 203(b). As the definition includes restatement of the word being defined (along with statement of oth-

er indices of commercial intercourse), it can only be intended to enlarge the scope and meaning of the word to include such transactions, conditions and relationships as have been heretofore known and acknowledged as constituting commerce in the Constitutional sense.

"Commerce," in the Constitutional sense, embraces not only shipment, but carriers engaged in interstate commerce, and the instrumentalities by which such commerce is carried on. This has not been questioned "since the decision in Gibbons v. Ogden, 9 Wheat. 1, 6 L.Ed. 23." Interstate Commerce Commission v. Illinois Central Railroad Co., 215 U.S. 452, 30 S.Ct. 155, 162, 54 L.Ed. 280.

■ The "commerce" of the Act as relates to the production of goods is equally as broad as the commerce with reference to those engaged in commerce. In neither instance is the term restricted to the production, shipment, sale, transportation, or receipt of goods as articles of commerce, that is, those which are produced or sold for trade. Thus those who maintain the means of transportation, though having no direct connection with the manufacture, shipment, purchase or sale of the goods transported, are engaged in commerce because patently their work is essential to the carrying on of commerce. Morgan v. Atlantic Coast Line Railroad Co., D.C., 32 F.Supp. 617.

■ It is not thought any one would contend that an engineer of an interstate train is not engaged in commerce. Likewise, all others whose services are essential to the carrying on of commerce are engaged in commerce. This is well established by legislative and judicial history. As stated by Judge Powell in Charleston & Western Carolina Ry. Co. v. Anchors, 10 Ga.App. 322, 325, 73 S.E. 551, 552: "It is very difficult to impose the limitations of a definition upon the word 'commerce' as used in the federal Constitution. How this term, which originally was considered as almost synonymous in meaning with the word 'trade,' has been enlarged so as to include contracts, transportation, ways, means, and agencies, and even instrumentalities by which commercial intercommunications are carried on, is a matter of legal history."

■ In this case the scope of the term need not be explored to its full extent, and determination of its application to other different and varying transactions than here involved would be superfluous. The

definition of commerce also includes transportation, and with the exception of the terms of Section 3(i), which will be hereinafter discussed, there is nothing in the Act which would restrict this term to one of its technical meanings,—the carrying of a shipment from consignor to consignee. Thus Congress must have used this term in its general sense, and have had in mind the meaning of this term as well understood and legally defined in other instances and situations.

As illustrative, Congress knew that the "transportation" of a motor vehicle under the terms of the Dyer Act, U.S.C.A., Title 18, § 408, was not restricted to shipment and included removal, and the same could be said of the use of the words "transporting or transportation" in the Mann Act, U. S.C.A., Title 18, § 398, and it must be presumed to know that the transportation there referred to was not restricted to that by carriers of passengers. Other instances could be mentioned with reference to quarantine laws, etc.

However, further conclusive is the statute relating directly to the situation and product now in question. By the terms of the Interstate Commerce Act, 49 U.S.C.A. § 1(3), "transportation * * * shall include * * * all services in connection with the * * * refrigeration or icing * * * of property transported," and it is made the duty of the carrier to furnish such "transportation." The Interstate Commerce Commission requires carriers to file tariffs showing rates and charges for icing and refrigeration. Code of Federal Regulations, Title 49, sec. 141.10.

■■■ From this statutory recognition of the interstate character and necessity of such icing service it is apparent that goods necessary to afford such service are, when so employed, an integral part of interstate commerce and therefore when produced in view of, or to serve as a part of such commerce, are "produced for commerce." Thus in the passage of the Act Congress was aware of the established legal implications inherent in the words "commerce" and "transportation" as applied to commerce. This will be conclusively presumed, but aside from the presumption it is further established as a fact by the express reference in its findings in the present Act not alone to commerce, but also to "instrumentalities of commerce."

■■■ So commerce as generally understood, and transportation as generally understood, and those acts, services and supplies which are a component part of the carrying on of such commerce, are fairly within the definition of commerce as contained in the Act. As thus construed, the phrase engaged in "the production of goods for commerce" includes "the production of goods in view of, or to serve as an essential part of interstate transportation or commerce." If any additional finding be needed to support the construction given the phrase, it may be stated that it is abundantly shown by the evidence in this case that the stoppage of production and use of the ice in question would produce the burden and obstruction of commerce referred to in findings 2, 4 and 5 of the declarations of policy of Congress.

In the absence of any authority, reason would dictate that if the Act be at all susceptible of this construction it should be so applied. Manifestly, unless required by expressed language, Congress would not be held to the intention of correcting detrimental conditions in commerce of manufacture and distribution, and yet held to have condoned by acquiescence or non-action the correction of such conditions when existing in the instrumentalities by which alone the prohibited and condemned distribution could be accomplished.

If it is necessary to control the production, sale, shipment, transportation and delivery of the defined goods in order to effectuate the intention of Congress, certainly like control is necessary and included within the Act of the production of commodities so essential to the transportation (commerce) that the continuity of such components of commerce cannot be maintained without it.

In the present case it is conceded that without the use of the ice supplied to the Fruit Growers Express and the railroads, the interstate commerce in the perishable goods handled could not be carried on. The same is likewise true as to interstate shipments of such goods by truck. Under the proper construction of the Act, the ice produced for such icing and refrigeration is produced "in view of, or to serve as an essential part of, interstate transportation or commerce," and employees who produce it are engaged "in the production of goods for commerce" within the terms and intent of the Act, and those who deliver and place it in refrigerator cars and trucks are "engaged in commerce" and "in the production of goods for commerce."

Defendant contends that even if it be held by the Court that the production and sale of ice under the circumstances disclosed by the evidence is the "production of goods for commerce," that the ice is not included within the definition of the word "goods" in Section 3(i) of the Act. The pertinent provision is that the term goods "does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof."

It is contended that because the purchasers of the ice in question are the ultimate consumers of the ice, that the exclusion removes the ice from its character as "goods." Defendant contends that it is apparent from this exclusion that it was not the intention of Congress to apply the statute to a producer who sold to an ultimate consumer, unless the ultimate consumer was a producer, manufacturer or processor.

On the other hand, the plaintiff contends that the exclusion in the definition merely provides an exemption from the penalties of Section 15(a)(1) in case a purchaser, innocent of a violation of the Statute in the production of goods, were to transport the goods purchased across State lines. It is further contended by the plaintiff that in no event can the exclusion aid the defendant, for it applies only after they are actually delivered.

■ Laying aside technical niceties, and seeking to give the exclusion a reasonable meaning, it is apparent in view of the entire legislative scheme that it is not all goods subject to the Act which are excluded from the definition. As the word is employed in the Act, "goods" is used in only two meanings, viz.: (1) with reference to production; and (2) with reference to transportation. In the present case we are only concerned with the production feature.

Production of goods presupposes acts and employment prior to any delivery, and there can be no reasonable construction of the statute which would relate the condition of goods after delivery to production. Goods cannot be produced after they are in the actual physical possession of the ultimate consumer. Statement of this term of the statute, with the exclusion appended, discloses the unreasonableness of such construction. Thus, "every employer shall pay to each of his employees engaged in the production of goods, but not including goods after their delivery into the actual physical possession of the ultimate consumer thereof," makes no sense at all, for as above stated the production aimed at by the Act must precede the delivery.

This difficulty does not arise when applying the exclusion to goods shipped, transported, or carried, for in such case they are already produced and no penalty as to the shipment, transportation or carriage by the ultimate consumer after delivery of actual physical possession to him is provided by the terms of the Act. This provision of the statute, in common with the entire Act, must be given a reasonable construction to effectuate the intention of Congress, and as so construed the exclusion has no application to the production and sale of ice by the defendant to the purchasers in the present instance.

The contention of the defendant that this exclusion from the definition of the word "goods" evidences an intention by Congress that the Act should not apply to the users of the goods or commodities produced for commerce, other than to the extent of excepting from the exclusion a producer, manufacturer, or processor, is not supported. The reason for this exception is not material to a construction of the exclusion as applied to this case. However, it would seem that Congress meant to make clear that a manufacturer or processor was not, strictly speaking, an ultimate consumer. These latter words were added by amendment and were not included within the definition of exclusion as contained in the original bill.

As concerns this case, the exemption relied on by the defendant, while it might avail the purchaser of the ice, does not take the production of ice out of the terms of the Statute relating to the production of goods, nor does the fact that the purchaser might be relieved in his use of the ice require the construction that the defendant, in the production of goods for such ultimate consumer (even if it be conceded that the purchaser is such consumer, which is not necessary for decision here), is exempted from the provisions of the Act.

■ The exclusion in Section 3(i) is patently for the benefit of the ultimate consumer, and thus viewed, the argument of defendant falls. Section 15(a)(1) does not punish a receiver who is an ultimate consumer, no matter what antecedent violations of the Act may have occurred. It

may be safely assumed that an ultimate consumer, who is neither a producer, manufacturer, or processor of the goods consumed, would participate no further in the carrying on of interstate commerce. It would serve no useful purpose to answer each of the arguments presented. The above discussion controls and answers each contention of the defendant.

Applying the law as thus construed to the facts shown by the evidence, the defendants employed in the production and delivery of such ice employees in violation of Sections 6 and 7, and violated provisions of Section 15(a) (5) relating to records.

IV. Validity of the Employment Cards.

It might appear that the foregoing reasons and grounds of findings of fact and conclusions of law would be sufficient to alone authorize the issuance of the injunction sought by the plaintiff. However, a ruling of the Court for findings of fact and conclusions of law with reference to another phase of the case is expressly invoked. This question, of the validity of "employment cards" entered into between the defendant and certain salaried employees was presented upon the trial, is strenuously argued in the briefs of the parties, and the plaintiff requests thereon the adoption of findings of fact and conclusions of law declaring their invalidity, and a request for the adoption of conclusions of law construing certain provisions of Section 7 of the Act and the legality of the cards thereunder is likewise made.

The questions thus presented have proven interesting and the efforts at reasoning from which was deduced the findings and conclusions reached by the Court will be stated.

On the effective date of the Fair Labor Standards Act, defendant had on its pay rolls many employees who were paid lump-sum weekly or semimonthly salaries. No change was made in any of these salary arrangements until the middle of February, 1940. It has been determined herein that many of these employees are covered by the Act. Most of the employees worked overtime.

In February, 1940 the defendant, through its general manager, sent out instructions to all foremen and those in supervisory capacities to obtain the signatures of all salaried employees to "employment cards." These cards, stated to be "terms of employment," purport to be an agreement be-tween the employee and employer, which contain the following: (1) statement of "number of hours to be worked weekly" which exceeds forty hours; (2) rate of pay for "first 40 hours per week" usually at 30 cents per hour; and (3) a specified number of hours, sufficient, when added to the "first 40" to make the total "hours to be worked weekly" under (1) above, "overtime at" a rate per hour which when added to (2) above, equalled or exceeded the previous weekly compensation; and (4) statement of "Total weekly compensation" arrived at by addition of (2) and (3) above. Thus the arrangement begins with the requirement of a specified "number of hours to be worked weekly" (which exceeds the statutory work week) for a "total weekly compensation," expressed by a stated amount. In operation, the number of overtime hours worked varied from time to time, but did not exceed the total hours specified. Typical overtime payments for the fixed hours as shown by cards introduced in evidence vary from 45 cents per hour to $1.13 per hour, but with pay for forty hours usually at the rate of 30 cents per hour.

Defendant contends that the purpose of the arrangement was three-fold: First, to fix wages and hours weekly for forty hours a week; second, not to reduce the compensation of any employee; and, third, to insure to each employee a fixed minimum compensation regardless of how little overtime he might work in a particular week or month.

This arrangement is attacked by the plaintiff as a violation of the statute, it being contended that the "regular rate of pay" is that determined by dividing the hours worked into the weekly wage. The defendant contends that there is no way of determining what is the regular rate for statutory-time and overtime where a lump-sum salary is paid, and that regardless of this the arrangements entered into in February, 1940, established a regular rate, and that as the payment for overtime equals or exceeds one and one-half times the established rate there is no violation of the statute as to these employees.

The real question is whether the employment card arrangement meets the requirements of the statute. The Fair Labor Standards Act relates as well to overtime hours as to minimum compensation. The objectives of a minimum wage and a maximum work week are equally evident.

The question then revolves around the proper construction of Section 7(a) of the Act which forbids employment of any employee for a work week longer than that prescribed "unless such employee receives compensation for his employment in excess of the hours above specified [the permitted statutory work week] at a rate not less than one and one-half times the regular rate at which he is employed." There is thus no limit of overtime, and no establishment of a maximum work week in hours, if the prescribed requirement as to rate of pay for overtime is observed.

The first question then is what is the regular rate of pay. No difficulty would arise in determining the regular rate of pay if the employee was employed only for the permitted statutory hours, for the determination of the hourly rate then would be a simple question of arithmetic. The difficulty arises in case of lump-sum payments, either weekly, semimonthly, or otherwise for hours in excess of the statutory hours. In such a case as a matter of fact it is impossible to determine the regular rate for the statutory work week by any means other than upon an average hourly basis, that is, the number of hours worked divided into the total compensation on a weekly basis, as the Act contemplates a separate work week for each week.

Manifestly one employed to work a week of fifty hours for a weekly compensation of $20 is working for 40 cents per hour, and this is his regular rate of pay per hour. This is the regular rate referred to in Section 7(a) and furnishes the basis of computation of overtime for hours worked above the statutory work week. Section 7(a) is independent of Section 6, and while the regular rate of pay is not required to be more than the statutory minimum, when it in fact is more payment for overtime above the statutory work week must equal one and one-half times the regular rate of pay.

The principle becomes clear if Section 7(a) of the Act be considered, as it is, a separable part of the statute, not dependent upon the minimum wage requirements of the Act. To reach the objectives of the Act the Congress imposed the penalty for overtime work upon the employer paying more than the minimum wage as well as upon the lower wage-payer.

It is not held that wages may not be reduced, if not below the statutory minimum which would be prohibited by the wage provisions of the statute, or that employer and employee may not establish compensation for the statutory hours by agreement. Manifestly though, when such purported agreement constitutes only an arbitrary allocation of a portion of the total guaranteed weekly salary to obtain a rate per hour for the statutory hours, and with the remainder divided into a fixed number of hours which may or may not be worked, by which is obtained a mathematical rate for overtime which when added to the allocation to statutory time totals the guaranteed weekly compensation, such allocated arbitrary rate does not constitute the regular rate at which the employee is employed. Under the evidence the arrangement employed in this case is subject to the infirmities just mentioned.

Thus in the present case it is clear that there was no agreement as to a rate of pay for the statutory hours alone which is a prime essential to the establishment of the regular rate of pay referred to in Section 7(a). The total weekly pay following the execution of the employment cards equalled that previously paid for a week's work. Thus there is only an agreement for a week's work from which in fact and reason it is impossible to determine regular pay for statutory hours except as directly related to and dependent upon the total pay.

The cards do not evidence an actual bona fide agreement for pay for a week of forty hours, but an agreement as to how much of the total payment for forty-eight to sixty hours will be allocated to the forty hours if the total time and overtime is worked, when the total payment would be made without regard to any consideration but the total work week required to earn it. While the employment card seeks to comply with the requirements of the statute as to compensation, it overlooks the correlative, yet independent, requirements as to hours. No rate of pay was established for the forty hours independent of and without regard to the specified overtime. The employee agrees to work the total hours for the total payment. It is apparent for the reasons above stated that the first and underlying purpose of the arrangement stated by the defendant never became effective for the reason that the same did not under the facts establish an agreed rate of pay for the statutory week but rather constituted an allocation of a portion of the total compensation to the

statutory hours, which results in vastly different consequences.

It is concluded under the evidence and the applicable law that the employment cards do not evidence establishment of the regular rate of pay as contemplated by the Act.

The contention of defendant, reduced to its last analysis, rests alone on the proposition that if the total weekly salary is sufficient to pay the statutory minimum for the statutory maximum work week, together with overtime computed on the basis of the statutory minimum of 45 cents per hour, that such payment is compliance with the statute. This necessarily follows from the plan presented and the argument in support thereof, for while the contention is expressed in different language and the method of arriving at defendant's conclusion is differently stated, such necessarily results from the arrangements made. The construction of "regular rate of pay" makes clear the nonacceptance of this argument.

■ It is within the legislative power to fix maximum hours and a minimum work week [United States v. Darby Lumber Co., 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430], and it follows it may prescribe the terms on which overtime may be worked. Thus no constitutional questions are presented in this case, but only whether the employment arrangement complies with the requirement of the statute. For the reasons stated, and especially in view of the fact that the arrangement in fact establishes no regular rate of pay for the statutory work week, it is concluded that the arrangement does not meet the requirements of the statute.

It follows that the wages paid under the purported employment agreements to those of defendant's employees engaged in commerce, or in the production of goods for commerce, was not in compliance with the provisions of Section 7(a) of the Act and as to such employees constituted violation of its terms.

The plaintiff is entitled to injunction as prayed, and proper order and decree providing therefor may be presented after notice.

### On Motion for Rehearing.

In an opinion filed two days before the decision in Fleming, Administrator, v. A. H. Belo Corporation, 5 Cir., 121 F.2d 207, 211, was announced, this Court in construing the Fair Labor Standards Act determined that Section 7(a), 29 U.S.C.A. § 207(a), relating to overtime employment, was such a separable part of the statute as to make the validity of any agreement for a lump-sum payment dependent upon the establishment of a regular rate of pay for the statutory work week provided by the Act. Consequently, having determined as a fact that in the execution of the employment cards the employees gave no consideration to the statement therein of the compensation for the statutory week but only considered the contract as a whole, this Court concluded that the arrangement was not permitted by the Act.

Following the above decision by the Circuit Court of Appeals, defendant has moved for rehearing of this question among others and has requested that additional findings of fact be made and a different conclusion of law with respect to said cards be entered. The motion was granted, and after a hearing and further consideration of the ruling in Fleming, Administrator, v. A. H. Belo Corporation, supra, it appears it was there determined that in the statute there is an absence of any "prohibition against or limitation upon" the making of agreements by employers with their employees, and that the overtime provisions of the Act "are inserted not at all to discourage or limit overtime work." Thus, that the validity of any arrangement between employer and employee is to be determined by general contract law.

■ Considered as not controlled by the terms of the Act, the employment card arrangement as a whole evidences a binding arrangement, even though not establishing any factual agreement for compensation for forty hours. Admittedly an anomalous situation, the cards thus present a valid contract in law but not a factual contract as to detail. However, the latter would now appear to be immaterial and thus the prior ruling of the Court was erroneous.

### Additional Findings of Fact.

Additional findings of fact are made as follows:

A. The employees whose signatures are affixed to the employment cards actually signed the same, without the result of fraud or vitiating duress, and without the operation of any device or misrepresentation on the part of the employer. They were persons able to read and understand the language on said cards. They were thereafter paid the total compensation thereon pro-

vided, and some of the employees received small increases in compensation for substantially reduced working hours, and the defendant substantially observed the total hour provisions thereon provided.

B. As a matter of fact the employees signing said cards gave no consideration to the details thereon, looking only to total hours to be worked and total compensation to be received.

### Conclusions of Law.

A. As a matter of general law, and without regard to the Fair Labor Standards Act, the employment cards evidence an enforceable contract of employment.

B. Under the ruling in Fleming, Administrator, v. A. H. Belo Corporation, supra, the employment card arrangement constituted compliance with the terms of the Fair Labor Standards Act.

C. The plaintiff is not entitled to the injunction prayed with reference to the employees executing such employment cards.