## PEOPLE v. COMPAGNIE GÉNÉRALE TRANSATLANTIQUE.

1. The statute of New York of May 31, 1881, imposing a tax on every alien passenger who shall come by vessel from a foreign country to the port of New York, and holding the vessel liable for the tax, is a regulation of foreign commerce, and void. *Henderson* v. *Mayor of New York*, 92 U. S. 259, and *Chy Lung* v. *Freeman*, id. 275, cited, and the rulings therein made reaffirmed.

2. The statute is not relieved from this constitutional objection by declaring in its title that it is to raise money for the execution of the inspection laws of the State, which authorize passengers to be inspected in order to determine who are criminals, paupers, lunatics, orphans, or infirm persons, without means or capacity to support themselves and subject to become a public charge, as such facts are not to be ascertained by inspection alone.

3. The words "inspection laws," "imports," and "exports," as used in cl. 2, sect. 10, art. 1, of the Constitution, have exclusive reference to property.

4. This is apparent from the language of cl. 1, sect. 9, of the same article, where, in regard to the admission of persons of the African race, the word "migration" is applied to free persons, and "importation" to slaves.

ERROR to the Circuit Court of the United States for the Southern District of New York.

The case is fully stated in the opinion of the court.

*Mr. William M. Evarts*, *Mr. George N. Sanders*, and *Mr. Lewis Sanders* for the plaintiff in error.

*Mr. Frederick R. Coudert* for the defendant in error.

MR. JUSTICE MILLER delivered the opinion of the court.

This was an action commenced by the People of the State of New York, in the Court of Common Pleas for the City and County of New York, to recover of the defendant the sum of one dollar for each alien passenger brought into New York by its vessels, for whom a tax had not before been paid, with penalties and interest. The case was removed into the Circuit Court of the United States, which, on demurrer to the complaint, rendered a judgment in favor of the defendant. The plaintiff then brought this writ of error.

The tax in this case is demanded under sect. 1 of a statute of New York, passed May 31, 1881, entitled "An Act to raise money for the execution of the inspection laws of the State of New York." The section reads thus: —

"Sect. 1. There shall be levied and collected a duty of one dollar for each and every alien passenger who shall come by vessel from a foreign port to the port of New York for whom a tax has not heretofore been paid, the same to be paid to the chamberlain of the city of New York by the master, owner, agent, or consignee of every such vessel within twenty-four hours after the entry thereof into the port of New York."

It has been so repeatedly decided by this court that such a tax as this is a regulation of commerce with foreign nations, confided by the Constitution to the exclusive control of Congress, and this court has so recently considered the whole subject in regard to similar statutes of the States of New York, Louisiana, and California, that unless we are prepared to reverse our decisions and the principles on which they are based, in the cases of *Henderson* v. *Mayor of New York* and *Chy Lung* v. *Freeman*, 92 U. S. 259, 275, there is little to say beyond affirming the judgment of the Circuit Court, which was based on those decisions.

The argument mainly relied on in the present case is that the new statute of New York, passed after her former statutes had been declared void in *Passenger Cases*, 7 How. 283, and in the recent case of *Henderson* v. *Mayor of New York*, is in aid of the inspection laws of the State. This argument is supposed to derive support from another statute passed three days earlier, entitled "An Act for the inspection of alien emigrants and their effects by the commissioners of emigration."

This act empowers and directs the commissioners of emigration "to inspect the persons and effects of all persons arriving by vessel at the port of New York from any foreign country, as far as may be necessary, to ascertain who among them are habitual criminals, or pauper lunatics, idiots, or imbeciles, or deaf, dumb, blind, infirm, or orphan persons, without means or capacity to support themselves and subject to become a public charge, and whether their persons or effects are affected with

any infectious or contagious disease, and whether their effects contain any criminal implements or contrivances."

Subsequent sections direct how such characters, if found, shall be dealt with by the board. Other sections of the act of May 31 direct the chamberlain of the city to pay over to the commissioners of emigration all such sums of money as may be necessary for the execution of the inspection laws of the State of New York, and the net produce of all duties received by him under that act, after the necessary payments to the commissioners of emigration, to the treasury of the United States.

These two statutes, construed together, it is argued, are inspection laws within the meaning of art. 1, sect. 10, cl. 2, of the Constitution of the United States, to wit: "No State shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws; and the net produce of all duties and imposts laid by any State on imports or exports shall be for the use of the treasury of the United States, and all such laws shall be subject to the revision and control of the Congress."

What laws may be properly classed as inspection laws under this provision of the Constitution must be determined largely by the nature of the inspection laws of the States at the time the Constitution was framed.

In the opinion of this court in the case of *Turner* v. *Maryland*, delivered by Mr. Justice Blatchford contemporaneously with the one in the present case, there is an elaborate examination of those statutes, many of which are cited, *ante*, pp. 51–54. Similar citations are found in a foot-note to the report of *Gibbons* v. *Ogden*, 9 Wheat. 1, 119.

We feel quite safe in saying that neither at the time of the formation of the Constitution nor since has any inspection law included anything but personal property as a subject of its operation. Nor has it ever been held that the words "imports and exports" are used in that instrument as applicable to free human beings by any competent judicial authority.

We know of nothing which can be exported from one country or imported into another that is not in some sense property,

—property in regard to which some one is owner, and is either the importer or the exporter.

This cannot apply to a free man. Of him it is never said he imports himself, or his wife or his children.

The language of sect. 9, art. 1, of the Constitution, which is relied on by counsel, does not establish a different construction: " The migration or importation of such persons as any of the States now existing shall think proper to admit, shall not be prohibited by the Congress prior to the year one thousand eight hundred and eight, but a tax or duty may be imposed on such importation, not exceeding ten dollars for each person."

There has never been any doubt that this clause had exclusive reference to persons of the African race. The two words " migration" and " importation " refer to the different conditions of this race as regards freedom and slavery. When the free black man came here, he migrated; when the slave came, he was imported. The latter was property, and was imported by his owner as other property, and a duty could be imposed on him as an import. We conclude that free human beings are not imports or exports, within the meaning of the Constitution.

In addition to what is said above, it is apparent that the object of these New York enactments goes far beyond any correct view of the purpose of an inspection law. The commissioners are " to inspect all persons arriving from any foreign country to ascertain who among them are habitual criminals, or pauper lunatics, idiots, or imbeciles, . . . or orphan persons, without means or capacity to support themselves and subject to become a public charge."

It may safely be said that these are matters incapable of being satisfactorily ascertained by inspection.

What is an inspection? Something which can be accomplished by looking at or weighing or measuring the thing to be inspected, or applying to it at once some crucial test. When testimony or evidence is to be taken and examined, it is not inspection in any sense whatever.

Another section provides for the custody, the support, and the treatment for disease of these persons, and the retransportation of criminals. Are these inspection laws? Is the ascertainment of the guilt of a crime to be made by inspection?

In fact, these statutes differ from those heretofore held void only in calling them in their caption "inspection laws," and in providing for payment of any surplus, after the support of paupers, criminals, and diseased persons, into the treasury of the United States, — a surplus which, in this enlarged view of what are the expenses of an inspection law, it is safe to say will never exist.

A State cannot make a law designed to raise money to support paupers, to detect or prevent crime, to guard against disease, and to cure the sick, an inspection law, within the constitutional meaning of that word, by calling it so in the title.

Since the decision of this case in the Circuit Court, Congress has undertaken to do what this court has repeatedly said it alone had the power to do. By the act of Aug. 3, 1882, c. 376, entitled "An Act to regulate immigration," a duty of fifty cents is to be collected, for every passenger not a citizen of the United States who shall come to any port within the United States by steam or sail vessel from a foreign country, from the master of said vessel by the collector of customs. The money so collected is to be paid into the treasury of the United States, and to constitute a fund to be called the immigrant fund, for the care of immigrants arriving in the United States, and the relief of such as are in distress. The Secretary of the Treasury is charged with the duty of executing the provisions of the act and with supervision over the business of immigration. No more of the fund so raised is to be expended in any port than is collected there. This legislation covers the same ground as the New York statute, and they cannot coexist.

*Judgment affirmed.*