## McGOLDRICK, COMPTROLLER OF THE CITY OF NEW YORK, *v.* GULF OIL CORP.

No. 473.   Reargued February 27, 1940.—Decided March 25, 1940.

*Mr. Paxton Blair,* with whom *Messrs. William C. Chanler* and *Sol Charles Levine* were on the brief, for petitioner.

418

*Mr. Matthew S. Gibson* for respondent.

By leave of Court, *Messrs. George deForest Lord* and *Woodson D. Scott,* as *amici curiae,* filed a brief on behalf of the Cunard White Star, Ltd., challenging the validity of the tax.

MR. JUSTICE STONE delivered the opinion of the Court.

The Comptroller of the City of New York determined that respondent was subject to a New York City tax laid upon sales in 1934 and 1935 of fuel oil manufactured in New York City, from crude petroleum, which had been imported from a foreign country to New York, and there sold and delivered as ships' stores to vessels engaged in foreign commerce. Upon certiorari to review the Comptroller's determination, the Appellate Division of the New York Supreme Court held that the taxing statute as applied infringed the power of Congress to regulate foreign commerce which it had exercised by statutes regulating the control and disposition of the imported oil. 256 App. Div. 207; 9 N. Y. S. 2d 544.

The New York Court of Appeals affirmed without opinion; 281 N. Y. 647; 22 N. E. 2d 480, but by its amended remittitur declared that the affirmance was upon the ground, and none other, that the tax as applied

violated the commerce clause of the Federal Constitution, Article I, § 8, Clause 3, Article I, § 10, Clause 2, which commands that no state shall lay any imposts or duties on imports or exports, and Article VI, Clause 2, making the "Constitution and laws of the United States which shall be made in pursuance thereof . . . the supreme law of the land." [1] We granted certiorari upon a petition which challenged the several grounds of decision as defined by the amended remittitur of the Court of Appeals, the questions presented being of public importance.

The taxing enactment, Local Law No. 24 of 1934 (published as Local Law No. 25) is that of the municipal assembly of the City of New York, adopted pursuant to authority of Chapter 815 of the New York Laws of 1933, as amended by Chapter 873 of New York Laws of 1934. Its details were recently discussed in our opinion in *McGoldrick* v. *Berwind-White Coal Mining Co., ante,* p. 33, and it is unnecessary to repeat them here. It suffices to say that it lays a tax on purchasers for consumption of tangible personal property at the rate of 2 per cent. of the sales price. The tax is conditioned upon events occurring within the state, either transfer of title or possession of the purchased property, or an agreement within the state, "consummated there" for the transfer of title or possession. The duty of collecting the tax and paying it over to the Comptroller is imposed on the seller,

[1] Certiorari which had been allowed by the Supreme Court of the United States December 4, 1939, 308 U. S. 545, before the amendment of the remittitur by the New York Court of Appeals, was dismissed January 15, 1940, *ante,* p. 2, on the ground that in the absence of an explicit statement by the Court of Appeals that it had annulled the assessment of the tax solely because of the violation of the Federal Constitution, the Court was unable to find that the decision of the highest court of the state did not rest upon an adequate non-federal ground. On motion for rehearing, based on the amended remittitur of the Court of Appeals, the order of dismissal was, on February 5, 1940, vacated and the cause restored to the docket, *post,* p. 692.

who must pay it whether he collects it or not, in addition to the duty imposed upon the buyer to pay the tax to the Comptroller when not so collected.

The material facts are not in dispute. In 1934 and 1935 respondent's predecessor imported crude petroleum from Venezuela and made customs entry of it for its own manufacturing warehouse in New York City, pursuant to its bonds known as "Proprietor's Manufacturing Warehouse Bond, Class 6," given to the United States under the warehouse laws of the United States and treasury regulations. The bonds were given for the purpose of enabling the importer, under statutes of the United States and treasury regulations, to bring the petroleum into the United States, to manufacture it while in bond into fuel oil and then to withdraw it for export or other lawful purpose free of the import duty which would otherwise be payable. The bonds were conditioned, among other things, upon compliance with laws and regulations relating to the custody and safekeeping of the imported merchandise and its products held in bond, and to its lawful withdrawal from the warehouse under permit of the collector of the customs within the time permitted by law.

The tax in question was laid on the sale of bunker "C" fuel oil, manufactured in respondent's bonded warehouse from the imported oil and delivered alongside foreign bound vessels in New York City which purchased the oil as ships' stores for consumption as fuel in propelling them in foreign commerce.

Petitioner argues that the tax imposed on the purchaser for consumption of the fuel oil after it had been changed radically by manufacture from the imported oil, and after it had been withdrawn from the bonded warehouse, is not a prohibited tax on imports and does not contravene any policy which the laws of the United States have sanctioned.

For present purposes we may assume, without deciding, that had the crude oil not been imported in bond it would, upon its manufacture, have become a part of the common mass of property in the state and so would have lost its distinctive character as an import and its constitutional immunity as such from state taxation. See *Gulf Fisheries Co.* v. *MacInerney,* 276 U. S. 124, 126; *Waring* v. *The Mayor,* 8 Wall. 110; *May* v. *New Orleans,* 178 U. S. 496; *New York ex rel. Burke* v. *Wells,* 208 U. S. 14. Respondent rests its argument on different considerations growing out of the control over the foreign commerce involved in the importation of the oil and its ultimate disposition as ships' stores of vessels engaged in foreign commerce, which Congress has exercised in pursuance of a national policy with which, it is insisted, the tax conflicts. Expression of this policy, it is urged, is to be found in the statutes of the United States, read in light of their legislative history, exempting the imported oil from federal taxation, otherwise imposed, if it is sold for use as fuel on vessels engaged in the foreign trade, and in the measures taken in statutes and regulations to make that policy effective by segregating the oil under the direction of customs officers of the United States from the time of its importation until it is delivered to the purchasing vessel.

The provisions of the Revenue Act of 1932 laying a tax on the importation of crude petroleum and granting exemptions, and the related provisions of the Tariff Act of 1930 and the applicable treasury regulations support this contention.

Section 601 (a), (c) (4) of the Revenue Act of 1932, 47 Stat. 169, 260, lays a tax "with respect to the importation" of crude petroleum of one-half cent per gallon unless otherwise provided by treaties of the United States, and § 601 (b) declares that the tax imposed "shall be levied, assessed, collected, and paid in the same

manner as a duty imposed by the Tariff Act of 1930 and shall be treated for the purposes of all provisions of law relating to the customs revenue as a duty imposed by such Act. . . ." Section 630 of the Revenue Act of 1932, added by amendment of June 16, 1933, 48 Stat. 256, declares that no tax under § 601 shall be laid "upon any article sold for use as fuel supplies, ships' stores . . . or . . . equipment on vessels . . . actually engaged in foreign trade . . ." and provides that "articles manufactured or produced with the use of articles upon the importation of which tax has been paid under this title, if laden for use as supplies on such vessels shall be held to be exported for the purposes" of the drawback provision of § 601 (b).

Section 309 (a) of the Tariff Act of 1930, 46 Stat. 590, 690, authorizes the withdrawal, duty free, under regulations of the Secretary of the Treasury of articles from bonded manufacturing warehouses, for supplies to vessels of the United States engaged in foreign trade and directs that no such article shall be landed at any port or place in the United States or its possessions. By virtue of the terms already noted of §§ 601 and 630 of the Revenue Act of 1932, these provisions were extended to articles sold for fuel to vessels engaged in foreign trade, and the provisions of statutes and regulations relating to withdrawal from manufacturing bonded warehouses [2] for export were thus extended to similar withdrawals of fuel oil for disposition as ships' stores.[3]

---

[2] Article 829 of the Customs Regulations of 1929, in force when the Tariff Act of 1930 was enacted and continued as Article 921 of Customs Regulations of 1931, and as Article 919 of Customs Regulations of 1937, defines Class 6 warehouses as those "for the manufacture in bond, solely for exportation, of articles made in whole or in part of imported materials. . . ."

[3] Section 311 of the Tariff Act of 1930, 46 Stat. 691, under which respondent's Class 6 bonded warehouse was established and operated, provided for the manufacture in such warehouse of articles made from

It will be noted that the tax imposed on importation of crude petroleum by § 601 of the Revenue Act of 1932 is, by force of its own provisions to be treated as a duty imposed by the Tariff Act of 1930, which, in turn, has incorporated, by reference, customs regulations relating to the entry of merchandise in bonded manufacturing warehouses, its manufacture there and its withdrawal from bonded warehouses for exportation or disposition as ships' stores; [4] that § 630, read in conjunction with § 601 (b) and the related provisions of the Tariff Act of 1930 (§ 309 [b]) provides that articles manufactured from imported articles and laden for use on vessels engaged in foreign commerce under customs regulations are to be duty free and considered or held as exported for the purpose of the drawback provisions of both § 601 of the Revenue Act of 1932 and § 309 (b) of the Tariff Act of 1930.

From the time of importation until the moment when the bunker "C" oil is laden on vessels engaged in foreign trade, the imported petroleum and its product, the fuel oil, is segregated from the common mass of goods and

imported materials and intended for exportation free of duty under such regulations as the Secretary of the Treasury might prescribe, and also declared that the provisions of § 1351 of Title 26, U. S. C. (§ 3433 of the Revised Statutes) should, so far as practicable, apply to such bonded manufacturing warehouses. Section 1351 provides for the manufacture in bonded warehouse of articles from imported materials under such rules as the Secretary may prescribe and under the direction of the proper customs officer, and directs that no article so manufactured in a bonded warehouse "shall be taken therefrom except for exportation under the direction of the proper officer having charge thereof . . . whose certificate describing the articles . . . shall be received by the Collector of Customs in cancellation of the bonds, or return of the amount of foreign import duties." See Articles 455, 457, and 960 of the 1931 Customs Regulations.

[4] See Articles 455 to 461, Customs Regulations of 1931, cf. Articles 410–414, Regulations of 1915; Articles 433–437, Regulations of 1923 and Articles 464–470 of the 1937 Regulations.

property within the state, and is subject to the supervision and control of federal customs officers.[5]  It cannot lawfully be removed from the manufacturing warehouse except for delivery for use as fuel to a vessel engaged in foreign commerce and it cannot lawfully be diverted from such destination and use and cannot, after delivery to the vessel, be landed in the United States.  Throughout, the oil is subject to the obligation of respondent's bonds that it shall remain under such supervision and control and shall not be diverted from its ultimate destination as ships' stores.

Article 942 of the Customs Regulations of 1931 provides that "merchandise in bonded warehouse is not subject to levy, attachment, or other process of a State court . . ." and that "imported goods in bonded warehouse are exempt from taxation under the general laws of the several States."  These regulations, continued in Customs Regulations of 1937, Art. 940, appeared as Art. 731, Regulations of 1915, and Art. 850 of Regulations of 1923.  They were thus in force when the Tariff Act of 1930 was adopted and were incorporated by reference, cf. *McCaughn* v. *Hershey Chocolate Co.,* 283 U. S. 488, 492, by the provisions of §§ 309, 311, already noted, which also adopted the earlier provisions of § 1351, Title 26, U. S. C., R. S. § 3433, and declared that articles manufactured from imported materials in bonded warehouse should be placed there under regulations prescribed by the Secretary of the Treasury.

The provisions of the Revenue Act of 1932, read with those of the Tariff Act of 1930 and with the statutes and regulations which we have mentioned, thus afford a comprehensive scheme for the regulation of the importation of the crude petroleum and of its control while in the

---

[5] See Ch. 16, Transportation in Bond and Merchandise in Transit; Ch. 17, Customs Warehouses and Control of Merchandise Therein, 1931 Customs Regulations.

course of manufacture in bond into fuel oil and its delivery as ships' stores to vessels in foreign commerce, all calculated to insure the devotion of the manufactured oil exclusively to that purpose.

The statutes and regulations taken together operate as regulations of foreign commerce, as the legislative history shows they were intended to do. The Tariff Act of 1930, of which § 601 of the Revenue Act of 1932 is in effect a part, is entitled, "An Act to provide revenue, to regulate commerce with foreign countries, to encourage industries of the United States, to protect American labor, and for other purposes." The obvious tendency of the exemption, from the tax laid upon importation of crude petroleum, when it or its product is used as ships' stores by vessels engaged in foreign commerce is to encourage importation of the crude oil for such use and thus to enable American refiners to meet foreign competition and to recover trade which had been lost by the imposition of the tax. That tendency, and the tendency of the sale of tax-free fuel to vessels engaged in foreign commerce to promote the commerce, were considerations to be taken into account by Congress in fixing the terms of the statute, and its adoption as a means of regulating and promoting foreign commerce was within the Congressional power. *Board of Trustees* v. *United States,* 289 U. S. 48.

That such was the purpose of the present legislation is confirmed by its history. Senate Report No. 58, 73d Cong., 1st Sess., on the bill which was enacted as § 630 of the Revenue Act of 1932, exempting fuel placed on vessels engaged in foreign commerce from the tax, declared, page 3: "It is believed that this amendment will enable the American manufacturers to compete more favorably with their foreign competitors for this business without any substantial loss of revenue, since the effect of the present law is to force purchases abroad." It

added that the provisions for drawback of the tax on importation "also relieves American manufacturers from a competitive disadvantage." From statements made on the floor of the Senate by the sponsor of the bill it appears that one purpose of the exemption was to increase the trade in fuel oil in American ports which had been lost through purchase of fuel in foreign ports by vessels engaged in foreign commerce following the imposition of the tax by § 601 (c) (4). 77 Cong. Rec., Part III, 3212–3214.

The laying of a duty on imports, although an exercise of the taxing power, is also an exercise of the power to regulate foreign commerce, *Hampton & Co.* v. *United States,* 276 U. S. 394, 411; *Board of Trustees* v. *United States, supra,* 58. The exemption of imports from the duty or the allowance of a drawback when they are devoted to particular purposes or uses, or when they are exported or otherwise sent out of the country, is likewise a regulation of foreign commerce, see *Gibbons* v. *Ogden,* 9 Wheat. 1, 201, 202; *Groves* v. *Slaughter,* 15 Pet. 449, 505. Customs regulations to insure the devotion of the imports to the intended use are likewise within the Congressional power since such regulations are not only necessary or appropriate to protect the revenue, but are means to the desired end, the regulation of foreign commerce by insuring that the particular class of exempted imports are used for the purposes for which the exemption is allowed.

The question remains, whether the present tax conflicts with the Congressional policy adopted by the Acts of Congress which we have discussed. As we have seen, the exemption and drawback provisions were designed, among other purposes, to relieve the importer of the import tax so that he might meet foreign competition in the sale of fuel as ships' stores. In furtherance of that end Congress provided for the segregation of the imported mer-

chandise from the mass of goods within the state, prescribed the procedure to insure its use for the intended purpose, and by reference confirmed and adopted customs regulations prescribing that the merchandise, while in bonded warehouse, should be free from state taxation. It is evident that the purpose of the Congressional regulation of the commerce would fail if the state were free at any stage of the transaction to impose a tax which would lessen the competitive advantage conferred on the importer by Congress, and which might equal or exceed the remitted import duty. See, *People* v. *Compagnie Generale Transatlantique,* 107 U. S. 59, 63. The Congressional regulation, read in the light of its purpose, is tantamount to a declaration that in order to accomplish constitutionally permissible ends, the imported merchandise shall not become a part of the common mass of taxable property within the state, pending its disposition as ships' stores and shall not become subject to the state taxing power. The customs regulation prescribing the exemption from state taxation, when applied to the facts of the present case, states only what is implicit in the Congressional regulation of commerce presently involved. The state tax in the circumstances must fail as an infringement of the Congressional regulation of the commerce. *Sinnot* v. *Davenport,* 22 How. 227; *People* v. *Compagnie Generale Transatlantique, supra,* 63; cf. *Kelly* v. *Washington,* 302 U. S. 1, 9, 10.

It is unnecessary to consider whether the tax upon the sale of the oil as ships' stores to vessels engaged in foreign commerce is in the circumstances of this case an impost on imports or exports, or a duty of tonnage prohibited by Article I, § 10, Clauses 2 and 3 of the Constitution.

*Affirmed.*

MR. JUSTICE McREYNOLDS took no part in the decision of this case.