# NORTHWEST AIRLINES, INC. v. COMMISSIONER OF REVENUE.

247 N. W. 2d 33.

October 8, 1976—No. 46410.

*Warren Spannaus*, Attorney General, and *C. Blaine Harstad* and *John R. Stoller*, Special Assistant Attorneys General, for relator.

*Johnson & Eastlund, George H. Johnson, Ralph W. Peterson*, and *James A. Abbott*, for respondent.

Heard before Otis, Todd, Yetka, and Marsden, JJ., and considered and decided by the court en banc.

TODD, JUSTICE.

The commissioner of revenue of the State of Minnesota (State) denied refunds to Northwest Airlines, Inc., (NWA) for state aviation fuel taxes paid by NWA on certain bonded aviation fuel stored and withdrawn from storage within Minnesota.

The flights involved either originated in the United States and made intermediate domestic stops en route to an ultimate destination in a foreign country, or originated in a foreign country and made intermediate domestic stops en route to an ultimate destination in the United States. The parties stipulated that passengers and cargo were boarded and deplaned at all domestic stops. The Tax Court reversed the order of the commissioner. We affirm.

The parties entered into a stipulation of facts, the pertinent portions of which provide:

"1.   Northwest has heretofore filed with the Commissioner claims for refundment of petroleum taxes paid upon aviation fuel withdrawn from bonded storage within Minnesota and boarded upon Northwest's aircraft * * *.[1] The records of Jerome Skar, Inc., Licensed Customhouse Broker, reflect that during the period for which said claims were filed, a total of 17,611,104 gallons of said bonded fuel was boarded at Minneapolis, Minnesota, upon Northwest's aircraft. These records also show that 57,961 gallons of said aggregate amount are subject to taxation by virtue of the fact that certain of said aircraft, originally destined ultimately for Winnipeg or the Orient, were aborted and terminated their flight outside the State of Minnesota but within the United States and, therefore, the total gallonage of bonded fuel involved in the within matter is 17,553,143 gallons. All of said gallonage was utilized by aircraft which did,

---

[1] Bonds are given by the importer to the United States Customs Service in order to enable the importer, under United States statutes and treasury regulations, to bring the oil into the United States for purposes of manufacturing (where crude petroleum is made into fuel oil) or storing it, and then withdrawing it for export or other lawful purpose free of the import duty which would otherwise be payable. The bonds are conditioned upon, inter alia, compliance with laws and regulations relating to the custody and safekeeping of the imported merchandise, and its lawful withdrawal from storage under permit of the Customs Service. See, McGoldrick v. Gulf Oil Corp. 309 U. S. 414, 422, 60 S. Ct. 664, 666, 84 L. ed. 840, 845 (1940).

in fact, complete their respective flights to Winnipeg, or the Orient, and return. The tax on said gallonage, at the rate of 1/2 cent per gallon, is the sum of $87,765.72, which is the amount claimed by Northwest in the within matter. * * *

"2. The fuel involved herein was imported under bond by Texaco, Inc. and pursuant to applicable federal law and regulations, remained in the legal custody of the United States Customs Service until its withdrawal from bonded storage for purposes of loading aboard said aircraft * * *.

"3. The aircraft in question were destined for either Winnipeg, or the Orient, and return to the United States.

"* * * After boarding bonded fuel in Minneapolis, some of these aircraft would have * * * further stops at points within the United States before reaching final destination * * *. At each of these stops, some passengers and/or cargo would generally be enplaned and deplaned."

The parties further stipulated that the sole legal issue presented on this appeal is—

"* * * whether the aircraft of Northwest which were engaged in the activities described herein * * * were engaged in 'foreign commerce' so that the aviation fuel utilized on such aircraft is not taxable by the State of Minnesota by virtue of the provisions of Minn. Stat. § 296.19; or whether, on the other hand, the fact that some passengers and/or cargo enplaned and deplaned at various points within the United States, as indicated above, renders the fuel in question taxable under c. 296."

The tax imposed herein is levied by the State under Minn. St. 296.025, subd. 2, imposing an excise tax upon "all special fuel * * * withdrawn from storage in this state, for use as substitutes for aviation gasoline * * *." NWA concedes the prima facie applicability of this statute to the fuel involved in this controversy. However, Minn. St. 296.19 provides that § 296.025 shall not apply to "foreign or interstate commerce, except insofar as the same may be permitted under the constitution and the laws

of the United States." NWA contends that the tax imposed by the State in this case, which would otherwise be properly levied under § 296.025, is inconsistent with the United States Constitution and statutes and is therefore, pursuant to § 296.19, invalid.

Section 309(a)(1)(C) of the Tariff Act of 1930, now embodied in 19 USCA, § 1309(a)(1)(C), as amended, exempts from customs duties and internal revenue tax any supplies for aircraft "actually engaged in foreign trade * * *." Therefore, if the flights at issue here constitute "foreign trade," Minn. St. 296.19 would apply, superseding § 296.025. In addition, NWA reaches the same conclusion through an alternative route: It contends that the numerous Federal statutes, regulations, administrative rulings, and court decisions relating to bonded aviation fuel evidence a congressional intent—consistent with U. S. Const. art. I, § 8, clause 3, vesting in Congress power to regulate foreign commerce—to preempt all state authority to tax or otherwise regulate this fuel.

The impact of these various interrelated state and Federal statutes and constitutional provisions upon this case thus resolves itself into the following: If the flights at issue constitute "foreign trade" or "foreign commerce" (the two terms will be used interchangeably throughout this opinion), NWA is entitled to the refund claimed by it but denied by the State. For this reason, the pivotal issue on this appeal is whether these flights are engaged in foreign commerce.

At oral argument, both parties conceded that the issue can be further refined as follows: Whether the decisive factors for determining if a particular flight is engaged in foreign commerce are the origin and destination of the aircraft itself, or rather, the origins and destination of the passengers and cargo carried on the aircraft.

The state advocates the latter position and accordingly concedes that if a flight destined for a foreign country makes an intermediate domestic stop, but no passengers or cargo are deplaned or boarded at such stop, the flight constitutes foreign

commerce and hence the bonded fuel boarded upon it is exempt from taxation. The State also agrees that bonded fuel used on a flight destined for a foreign country is exempt from taxation if passengers or cargo are enplaned at intermediate domestic stops. However, deplaning of any passengers or cargo at such intermediate domestic stops, under the State's analysis, would take this same foreign-bound flight out of the stream of foreign commerce. We note that the costs and administrative difficulties involved in maintaining records of the deplaning of passengers and cargo upon each flight, which would be necessary if the State's definition of "foreign commerce" were adopted, may not be insurmountable, but would certainly be significant.

The State's asserted rationale for its interpretation is that it prevents arbitrary discrimination against domestic carriers flying routes similar to those flown by the Northwest aircraft involved here. The State ignores the fact that this approach merely creates another type of arbitrary discrimination, namely, between those flights which deplane so much as one passenger or one piece of cargo at an intermediate domestic stop and those flights which do not.

The purpose behind the Federal legislation and regulations regarding bonded fuel was not to protect United States air carriers from any perceived discriminatory effects produced by the imposition of the excise tax upon oil used in foreign trade, but rather, to protect the United States petroleum industry from such discriminatory effects. Indeed, the precise legislative intent reflected in the fuel exemption contained in the Tariff Act of 1930, as explained by the United States Supreme Court in the leading case of McGoldrick v. Gulf Oil Corp. 309 U. S. 414, 427, 60 St. Ct. 664, 668, 84 L. ed. 840, 847 (1940), was "to encourage importation of * * * crude oil * * * [for use by vessels engaged in foreign commerce] and thus to enable American refiners to meet foreign competition and to recover trade which had been lost by the imposition of the tax." Congressional power to regulate foreign commerce for ends such as these is even

greater than the expansive congressional power to regulate inter-state commerce. The reasons underlying this tenet of our Federalism were articulated in the case of Epstein v. Lordi, 261 F. Supp. 921, 931 (D. N. J. 1966), enjoining—as an impermissible restraint on foreign commerce—the application of a New Jersey regulatory statute to bonded liquor stored in vessels docked in New Jersey but destined for use in foreign commerce:

"* * * [W]hen foreign commerce is involved the national interest is even more clearly paramount [than when interstate commerce is involved]. Federal power over such commerce is closely allied to its exclusive authority in foreign relations and it is buttressed by the Export-Import Clause which prohibits State imposts or duties levied without Congressional consent."

The State concedes the supreme authority of the Federal government in the regulation and taxation of foreign commerce and acknowledges that if the flights at issue constitute foreign commerce, the tax imposed herein was improper. However, the State asserts that it is free to interpret the term foreign trade or commerce differently from Federal authorities, rejecting NWA's position that the various Federal statutes, regulations, and administrative decisions in the field indicate a congressional intent to preempt all state authority over the matter, including the interpretation to be given to "foreign commerce." The State's position is logically untenable. If the states retained the power to define the nature of the "foreign commerce" over which the Federal government has unquestioned authority, the states could effectively curtail, if not nullify, the ostensible Federal authority over such matters. If U. S. Const. art. I, § 8, clause 3, prohibits a state from taxing an item which is bound up in foreign commerce, surely that constitutional provision enjoins a state from taxing the same item under the guise that it is not, by the state's definition, concerned with "foreign commerce."

This result, which is dictated by logic, is also supported by established rules of law to the effect that all state authority—including the type of authority asserted by the commissioner

herein, through a state administrative body, to define a critical term in a governing Federal statute—is preempted by any valid Federal authority in the area of foreign commerce. The general rule is stated as follows in 15 C. J. S., Commerce, § 15:

"A valid federal regulation of commerce supersedes state legislative enactments, authority of state judicial or administrative bodies, and state court decisions, on the same subject."

Moreover, the commissioner's attempt to challenge the validity or precedential value for such purposes of the administrative authorities cited by NWA also conflicts with the settled law on the matter:

"In accordance with the view that the regulation of commerce is exclusively within the power of Congress * * * where Congress regulates commerce by enacting a statute * * * that covers the same subject matter as * * * a state statute, the exercised power of Congress is not only supreme and paramount but also exclusive, superseding the state law and excluding additional or further regulation covering the same subject by the state legislature. * * * *The same result follows from the regulation of an agency or instrumentality of commerce by federal commissions or agencies * * *.*" (Italics supplied.) 15 C. J. S., Commerce, § 15.

The application of the general preemption principle in the area of foreign commerce to the specific matter of the Federal tax exemption for bonded fuel to be used on carriers ultimately destined for a foreign location was emphasized by the United States Supreme Court in the leading case of McGoldrick v. Gulf Oil Corp. *supra,* holding that the imposition of a New York city tax upon crude petroleum imported to New York under bond and there manufactured into fuel oil and sold and delivered as ships' stores to vessels engaged in foreign commerce, violated the commerce clause in view of the Tariff Act of 1930 and other Federal statutes and regulations, constituting "a comprehensive scheme for the regulation of the importation of the crude petroleum and

of its control while * * * in bond * * * and its delivery as ships' stores to vessels in foreign commerce." 309 U. S. 426, 60 S. Ct. 668, 84 L. ed. 847.

In view of the foregoing authorities we conclude that the Federal government has preempted state power to define the meaning of "foreign commerce." A review of the Federal authorities explicating the meaning of such term makes it clear that the origin and destination of the carrier itself, rather than of the passengers and cargo upon such carrier, are determinative.

The principle that the ultimate destination is determinative of a transaction's characterization as either intrastate, interstate, or foreign commerce, regardless of any intermediate stops or delays is a well-established tenet of commerce clause jurisprudence. E. g., Texas & N. O. R. Co. v. Sabine Tram Co. 227 U. S. 111, 33 S. Ct. 229, 57 L. ed. 442 (1913).

For other cases similarly holding that the character of foreign commerce attaches when something has been committed to a carrier to be transported in a continuous (even if interrupted) journey to an ultimate foreign destination, see 17 Wds. & Phr. (Perm. ed.) "Foreign Commerce," p. 413. Applying this well-settled general principle in the present case, it follows that, upon the withdrawal of the bonded fuel oil from storage for the purpose of placing it on an airplane to be transported in a continuous journey to a foreign destination, the characterization of foreign commerce attaches.

In addition to the general support of basic principles of commerce clause jurisprudence for NWA's asserted definition, of foreign trade, the case law affords specific support for the precise contention NWA makes, i. e., that intermediate domestic stops for purposes of loading and unloading passengers and cargo should not change the characterization of a carrier as being engaged in foreign commerce when its ultimate destination is foreign. In Standard Oil Co. of Louisiana v. United States, 3 Cust. Ct. 39 (C. D. 199) (1939), the tax exemption for fuel used on vessels "actually engaged in foreign trade" in the predeces-

sor to 19 USCA, § 1309, was held applicable to fuel used on a ship which followed a regular route from New Orleans to other Gulf Coast ports, where it discharged and received cargo, then returned to New Orleans to pick up additional cargo, and finally proceeded to various South American ports. The court explained (3 Cust. Ct. 48) :

"The loading of cargo at Pensacola, Mobile, and New Orleans destined for South America was not interstate or coastwise trade, but foreign trade, and since it was necessary for the *Delmundo* to proceed first to Pensacola for such purpose on her regular schedule the voyage made from New Orleans to Pensacola in ballast must also be considered as part of the operation of the vessel in the foreign trade. Viewed as a whole, therefore, the entire round trip made by the *Delmundo* from New Orleans to Pensacola, Pensacola to Mobile, Mobile to New Orleans, New Orleans to South America, and South America to New Orleans, was made in the foreign trade, and each of the separate voyages made from port to port, which all together made up the round trip, was likewise made in the foreign trade."

To similar effect, see United States v. Gulf Oil Corp. 32 C. C. P. A. 133 (1945).

It is true, as the State points out, that neither of these opinions specifically indicates whether cargo from one domestic port is *unloaded* at another (the State having conceded that intermediate domestic stops for purposes of *loading* passengers and cargo do not render a foreign-bound flight one engaged in domestic commerce). However, this lack of reference to the presence or absence of loading does not suggest, as the State urges, that such unloading must not have occurred and that if it did, it would have been fatal to the claimed tax exemption. On the contrary, the conclusion we draw is that this factor is simply irrelevant to the determination of whether the vessel is engaged in foreign commerce. The latter determination is based upon the route and ultimate destination of the vessel itself, and not of its passengers and cargo. Revenue Ruling 69-259, Cum. Bull. 1969-

1, 287, 288, holding that a plane ultimately bound for a foreign destination is engaged in foreign commerce even though it makes intermediate stops in the United States, whereas a plane carrying passengers ultimately bound for foreign destinations but itself only landing at domestic points (the passengers must transfer to other carriers in order to complete their international journeys) is engaged in domestic commerce, explicitly stated:

"* * * To be considered engaged in foreign trade, the airplane itself must travel to a foreign destination."

For decisions upholding the application of the tax exemption at issue in factual situations indistinguishable from the instant one, in that both the loading and unloading of passengers or cargo occurred at intermediate domestic stops, see TD 66-99(1), 119 Treas. Dec. 298, and TD 55200 (unpublished Bureau of Customs letter dated July 27, 1960).[2]

---

[2] While the United States Supreme Court's decision in McGoldrick v. Gulf Oil Corp. 309 U. S. 414, 60 S. Ct. 664, 84 L. ed. 840 (1940), did not directly address the question of whether the tax exemption in the Tariff Act of 1930 applies to bonded fuel used on carriers bound for foreign destinations regardless of any loading or unloading of passengers and cargo at intermediate domestic stops made by such carriers, it did indirectly countenance an affirmative response to such question by citing with approval a customs regulation which included such a situation within the scope of the tax exemption. Footnote 4 of the McGoldrick opinion cited Articles 455 to 461, Customs Regulations of 1931. Article 455(b) of the 1931 regulations, dealing with the privilege of tax-free withdrawal of fuel for ships engaged in foreign trade then provided as follows:

"Unless a vessel is operating on a regular schedule in a class of trade which entitles it to the privilege, it is not considered to be actually engaged in the foreign trade, or in trade between the Atlantic and the Pacific ports of the United States or between the United States and its possessions, unless it actually clears from the port where the withdrawal is made for a foreign port, a port on the opposite coast of the United States, or clears from a port in the United States to a port in one of its possessions (or vice versa), as the case may be; *but the fact that a ves-*

We conclude that under Federal authorities, which are preemptive of state authority in this area, a flight is engaged in foreign trade, and hence that bonded aviation fuel used upon it is exempt from the excise tax otherwise imposed under Minn. St. 296.025, when either its origin or ultimate destination is in a foreign country, regardless of whether passengers or cargo are enplaned or deplaned at intermediate domestic stops.

Affirmed.

MR. JUSTICE MACLAUGHLIN took no part in the consideration or decision of this case.

*sel so clearing intends to stop at an intermediate port* before reaching the port for which it cleared, *for the purpose of lading or unlading cargo or passengers, will not debar it from claiming the privilege."* (Italics supplied.)