COUNTY OF HARRIS, Texas et al., Appellants,

v.

XEROX CORPORATION, Appellee.

No. 17862.

Court of Civil Appeals of Texas, Houston (1st Dist.).

April 30, 1981.

Rehearing Denied May 21, 1981.

Joe Resweber, Paul Bibler, Edward Cazares, Cheryl Helena Chapman, Houston, for appellants.

Larry D. Thompson, William K. Luyties, Houston, for appellee.

Before COLEMAN, C. J., and SMITH and REDEN, JJ.

SMITH, Justice.

This is a declaratory judgment suited filed by Xerox Corporation requesting the court to declare unconstitutional certain ad valorem taxes assessed against it by the City of Houston, the Houston Independent School District, Harris County, and the State of Texas, and seeking injunctive relief. The trial court entered judgment declaring the taxes unconstitutional and enjoined the collection of the taxes.

The question presented in this case is whether nondiscriminatory ad valorem taxes assessed by state and local taxing authorities are violative of the commerce clause and the import-export clause of the United States Constitution where assessed against imported property stored in local customs bonded warehouses awaiting sale and shipment to a foreign country.

Xerox is incorporated under the laws of the State of New York and is authorized to transact business in the State of Texas. It is a manufacturer and seller of copier machines, engaging in both domestic and international commerce. It has affiliate companies in several foreign countries for the purpose of meeting certain governmental requirements of the respective countries as well as gaining certain benefits.

In the instant case Xerox manufactured its parts in Colorado and New York and transported these parts to a warehousing facility in Rochester, New York. To meet the requirements of the Latin American Free Trade Association (LAFTA),[1] Xerox established an affiliate company in New Mexico City to assemble copiers which would be functional in countries whose national language was either Spanish or Portugese.

To get parts to its Mexican affiliate, Xerox shipped its unassembled parts from Rochester to Laredo, Texas, and thence, by truck, to Mexico City, where the machines were set up and adjusted by Mexican labor trained for this purpose.

Mexican tax laws made the warehousing of the copiers in Mexico economically unfeasible; therefore, Xerox, up to the year of 1974, shipped its assembled copiers to the Free Trade Zone of Panama, where it had to pay no taxes on its warehoused merchandise.

In 1974, the Panamanian government and its people become hostile to American companies. Xerox made the decision not to jeopardize its merchandise in Panama and, after a search for another warehousing facility, decided to ship its products to Houston, Texas, because of its excellent port facilities.

Xerox shipped the assembled copiers under bond from Mexico City by truck to

---

1. LAFTA is a group of Latin American countries who associated themselves for the purpose of regulating imports into their respective countries and adopting certain policies to implement the purpose of the association.

Nuevo Laredo. The copiers were brought across the border under bond and placed in customs bonded warehouses. The machines were then transported by bonded trucking companies from Laredo to Houston, where they were placed in customs bonded warehouses. The uncrated machines remained in the warehouses, segregated from other merchandise, until Xerox obtained a sale. When a sale was obtained, the packaged machines were removed from the warehouse under bond and remained under bond until placed aboard a deep-water shipping vessel at Houston or Miami, to be transported to a Latin American country. No import taxes were ever assessed against these imported copiers by the United States.

Xerox maintained other warehouses in Houston for copiers that were to enter domestic commerce, and ad valorem taxes were paid on these. None of the imported copiers from the customs bonded warehouses were ever sold to customers for domestic use. No taxes were assessed on the imported machines by the local taxing authorities against Xerox in 1974 and 1975. In 1976, upon request from Xerox, Harris County, Texas, through an authorized deputy of the Tax Assessor-Collector, issued an exemption on the imported warehoused merchandise located in Houston. In 1977 the City of Houston [2] assessed taxes on the imported warehoused copiers and Harris County [3] followed by assessing taxes for 1977 and back assessing for the year of 1976.

In this suit we are concerned about the taxes for years 1976 and 1977 only, for the reason that as soon as Xerox was apprized that it was being assessed taxes on its imported copiers, it shipped all such merchandise to Buffalo, New York, a free trade zone location.

On assessment dates, January 1, 1976 and 1977, virtually none of the copiers in the warehouse had been sold or otherwise committed and none had been consigned to a common carrier. The length of time in storage varied from a few days to three years. The two model lines most numerously stored averaged seven and one-half months for one and twenty-five months for the other.

The parties agree that the ad valorem taxes levied were uniform non-discriminatory taxes on property, not based on origin or destination of goods. There is no claim by Xerox that the taxes were, in any manner, not properly assessed, except that they were unconstitutional as applied to the copiers in question.

The appellants assert as their first point of error that the trial court erred in finding that the copiers were not subject to state and local ad valorem taxation under the import-export clause of the United States. We agree.

Article I, Section 10, clause 2 of the United States Constitution, commonly referred to as the "import-export" clause, states as follows:

No state shall, without the consent of congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection law . . .

Section 8 of Article I of the United States Constitution commences by stating: "The Congress shall have the power to lay and collect taxes, duties, imposts and excises. . . ." It is manifest that the framers of the United States Constitution were addressing specific problems in limiting Section 10, clause 2 of Article I to "imposts and duties." The words "taxes" and "excises" are conspicuous by their absence from this section.

The position of Xerox in this suit was the law of the land, prior to 1976. *Brown v. Maryland*, 12 Wheat. 419, 6 L.Ed. 678 and *Low v. Austin*, 13 Wall. 29, 20 L.Ed. 517. However, in that year the United States Supreme Court in *Michelin Tire Corporation v. Wages*, 423 U.S. 276, 96 S.Ct. 535, 46 L.Ed.2d 495, overruled *Low v. Austin* and

---

**2.** The City of Houston assesses and collects taxes for itself and the Houston Independent School District.

**3.** Harris County assesses and collects taxes for itself, the State of Texas and several other local taxing authorities.

held that a nondiscriminatory ad valorem tax did not infringe upon the import-export clause where the imported goods were no longer in transit. Immediately thereafter, the Texas Supreme Court, relying on *Michelin,* reversed its holdings in *City of Farmers Branch, et al. v. Matsushita Electric Corporation of America,* 537 S.W.2d 452, 454 (1976) and in *City of Farmers Branch, et al. v. American Honda Motor Company, Inc.,* 537 S.W.2d 454 (1976) and held that "The ad valorem tax imposed by Farmers Branch is clearly nondiscriminatory and applicable to all such stored goods whether imported or not."

The question then arises, were the copiers involved in our suit still in transit? We think they were not.

■ The courts have established criteria to determine whether goods are in transit, i. e. (1) was there a stoppage in transportation, and, if so, what was the purpose of the stoppage? (2) at the time of taxation was the final destination of the goods determinable? and (3) was the stoppage a necessary delay or accommodation to the means of transportation, or for business purposes and profits of the company? See *Independent Warehouses v. Scheele,* 331 U.S. 70, 67 S.Ct. 1062, 91 L.Ed. 1346 (1947); *Michelin Tire Corporation v. Wages, supra; Calvert v. Zanes-Ewait Warehouse, Inc.,* 502 S.W.2d 689 (Tex.1973).

■ Applying these criteria, we find that there was a transportation stoppage of the warehoused copiers and that such stoppage was occasioned for business purposes of Xerox; that on taxation day the final destination of the goods was not determinable, as the property had not been sold or committed to further transportation; and that the business purpose in stoppage was profits for Xerox. We hold the warehoused Xerox copiers were no longer in transit.

■ The appellee also urges that the copiers were in the custody of customs officials stored in customs bonded warehouses, and that under such circumstances the federal government has preempted local taxing authorities by taking sole control. We cannot

concur in this view. The California courts in *American Smelting and Refining Company v. The County of Contra Costa,* 271 Cal.App.2d 437, 77 Cal.Rptr. 570 (1969) held contrary to Xerox's position and the Federal courts have not set aside or overruled that opinion. We are of the opinion and so hold that the storing of imported goods in a customs bonded warehouse in and of itself does not preclude local authorities from assessing and levying a nondiscriminatory ad valorem tax under the import-export clause of the United States Constitution absent Federal legislation or regulation to the contrary.

■ Appellee further asserts that its inventory of copiers is exempt because they are exports. This contention was rejected in *Kosydar v. National Cash Register Company,* 417 U.S. 62, 94 S.Ct. 2108, 40 L.Ed.2d 660 (1974), where in the Supreme Court set forth the test that the movement to foreign shores must be started or committed to be moved for an export to be exempt from taxation. There being no sale or commitment to sell and no movement or commitment to move, the export exemption does not apply in this case.

Appellants' first point of error is sustained.

The appellants' second point of error asserts that the trial court erred in concluding that the property was not subject to nondiscriminatory ad valorem taxes under the Commerce Clause of the United States Constitution.

Article I, Section 8, clause 3 of The United States Constitution, commonly referred to as the Commerce Clause, states as follows:

Congress shall have the power "To regulate Commerce with Foreign Nations and among the several states, and with Indian Tribes".

The commerce clause confers specific authority upon the United States Congress, however it should be noted that the conferral of authority and the exercising of that authority are distinct and separate matters.

Xerox asserts that *McGoldrick v. Gulf Oil Corporation*, 309 U.S. 414, 60 S.Ct. 664, 84 L.Ed. 840 (1940), is dispositive of the appellants' second point of error. We believe the cases are distinguishable. In *McGoldrick* the Supreme Court concluded that a New York sales tax upon oil imported to be refined and sold to foreign bound vessels was preempted by congressional legislation and invalid. Congress has not exercised its prerogative in such a manner as to preclude ad valorem taxes on goods such as the copiers involved in this case, even though it has authority to do so. It should be noted, however, that as a result of *Low v. Austin*, 13 Wall. 29, 80 U.S. 29, 20 L.Ed. 517 (1871), there is a footnote in the Code of Federal Regulations, 19 C.F.R. § 19.6(c), which states that "Imported goods in bonded warehouses are exempt from taxation or judicial process of any state or subdivision thereof." This footnote is not a regulation and as pointed out in *America Smeltering*, supra, *Michelin* overruled *Low* and the footnote has no more weight than the precedent upon which its rests. Suffice it to say, the *McGoldrick* decision was based on specific congressional legislation and, as noted above, no comparable legislation has been enacted that would prohibit taxation in this case.

Xerox takes the position that the most important purpose of the Commerce Clause and the Import-Export Clause is to prohibit state taxation from having any impact on the federal government's regulation of foreign commerce. We have no quarrel with this statement, in fact we agree that the federal government should speak with one voice in its regulation of foreign commerce. We are aware that local taxation will increase the cost of the product in the market place, be it a domestic or foreign market. The ability to compete in price is essential in the market place. Xerox has dropped from 95% of the Latin American copier market in 1976 to 74% in 1979, and in some countries its share has dropped to 40%. The bulk of the lost business has gone to Japanese competitors. We are not unaware that this same problem has occurred in automotive, television, radio, steel and many other industries. But the fact remains that the United States Congress has chosen not to enact legislation to protect the copier industry as it did for the oil industry in the *McGoldrick* case. The courts cannot enlarge legislation, nor can they legislate.

In this case the taxing authorities have furnished Xerox with port facilities, police and fire protection, streets for ingress and egress, and many other services, and the taxes represent the *quid pro quo*. Such taxes do not hamper, impede, nor deprive the federal government of its exclusive regulation of foreign commerce. *Michelin Tire Corporation v. Wages*, supra. Too, we find no fact findings that the taxes would impair Xerox's ability to compete in the foreign market, and the question of multiple taxation is not raised. See *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979).

Absent Federal Legislation or regulation to the contrary, we hold that a nondiscriminatory ad valorem property tax is not repugnant to nor violative of the commerce clause of the United States Constitution, where the domestic owner of property imports such property and warehouses it for the owner's convenience until such time as a sale may be obtained and the property exported. *Wabash Elevator v. People Of The State of Illinois*, 227 U.S. 504, 33 S.Ct. 299, 57 L.Ed. 615 (1913), *Susquehanna Coal Co. v. City of South Amboy*, 228 U.S. 665, 33 S.Ct. 712, 57 L.Ed. 1015 (1913). *Michelin v. Wages*, supra.

Xerox in its only cross-point alleges Harris County is estopped, as a matter of law, from making claim for taxes on the imported copiers stored in bonded warehouses in Harris County on January 1, 1976. The basis for such assertion is that Xerox requested and received from Harris County a

letter[4] of exemption for that year. H. F. Bruce was an appointed deputy for the duly elected Tax Assessor-Collector for Harris County, Texas and was the deputy who ordinarily handled matters of exemption in that office. Carl S. Smith, the Tax Assessor-Collector, stated that Mr. Bruce handled these matters, but in questionable matters such as this Mr. Bruce ordinarily conferred with him. Mr. Smith further stated that he had no recollection of Mr. Bruce's discussing the matter with him and that the letter was sent out erroneously.

■ The general rule has been in this state that when a unit of government is exercising its governmental powers, it is not subject to estoppel. *City of Hutchins v. Prasifka*, Tex., 450 S.W.2d 829 (1970). Chief Justice Greenhill in his opinion in *Prasifka* noted, "... That a municipality may be estopped in those case where justice requires its application and there is no interference with the exercise of this governmental function. But such doctrine is applied with caution and only in exceptional cases where the circumstances clearly demand its application to prevent manifest injustice."

■ In this case the taxing date was January 1, 1976. Xerox filed its inventory and evaluations as of that date. Xerox filed its request for exemption July 27, 1976, and the date of Mr. Bruce's exemption letter was August 9, 1976. We are of the opinion that no manifest injustice has occurred in this case. Xerox did not move its copiers into Harris County in reliance on such letter and there is no allegation of fraud or deceit by Xerox against Harris County officials.

Appellees cross-point is overruled.

■ Appellants by their third, fourth and fifth points of error complain that the injunctive relief granted by the trial court fails to comply with Rule 683, Tex.R.Civ. Proc., in that it (1) does not identify the parties enjoined (2) does not state the reason for the issuance of the injunction (3) does not identify the property involved, and (4) could be construed as operating for future taxes. Our disposition of previous points of error makes these objections irrelevant; but, we agree with these contentions, and, in the event we are held on appeal to have erred in our holdings, we suggest that the Judgment be remanded to the trial court to reform the injunctive portions of the judgment to comply with the requirements of Rule 683, T.R.C.P.

The judgment of the trial court is reversed and rendered that Xerox take nothing, that Harris County have judgment against Xerox in the sum of $131,311.97 plus penalties and interest for the tax years of 1976 and 1977, that the City of Houston have judgment for itself and the Houston Independent School District in the sum of $156,728.90 plus penalties and interest for the tax year of 1977, and that the injunction issued by the trial court is dissolved and set aside. Costs of appeal are charged to the appellee, Xerox.

COLEMAN, C. J., and PEDEN, J., sitting.

---

4.                                     August 9, 1976
  Xerox Corporation
  Xerox Square
  Rochester, N.Y., 14644

  Attention:  Mr. Ricardo S. Perez
              International Traffic Manager
              Building 822

  Dear Mr. Perez:

  Thank you for your affidavit dated July 27, 1976.

Please be advised that this inventory will be carried as Exempt, in as much as it was stored in Bond on January 1, 1976.

                        Sincerely,

                        Carl S. Smith
                        Tax Assessor-Collector

                        By:
                            H. F. Bruce
                            Deputy

HFB:bwe